(No. 26807.—■

HAROLD J. CROSBY *et al.*, Appellants, *vs.* MARTON M. WEIL *et al.*—(JULES C. LAZARD *et al.*, Appellees.)

*Opinion filed March 16, 1943—Rehearing denied May 13, 1943.*

SMITH, MARX & SMITH, CHARLES W. LAMBORN, and RAYMOND F. HAYES, (J. GLENN SHEHEE, of counsel,) for appellants.

MOSES, KENNEDY, STEIN & BACHRACH, (WALTER BACHRACH, and WALTER H. MOSES, of counsel,) for appellees.

Mr. JUSTICE FULTON delivered the opinion of the court:

By this appeal the appellants, who were the original plaintiffs, seek to reverse a judgment of the superior court of Cook county striking the third amended complaint filed

by them. The appeal was taken directly to the Appellate Court and the appellees there moved for a transfer of the appeal to this court on the ground that a constitutional question was involved. The Appellate Court sustained the motion and entered an order transferring the appeal to this court. The action is based upon section 37 of the Illinois Securities Law and is brought by appellants, as purchasers of stock in the General Carpet Corporation, against the appellees, who are brokers engaged in the business of selling securities, to recover the purchase price thereof and other costs incurred by appellants, on the theory that said securities were class D securities not qualified in the State of Illinois and were thus sold in violation of the Illinois Securities Law.

The complaints as amended allege that the appellees, copartners with other defendants under the name of Marks, Laser & Co., were agents and brokers maintaining offices in the city of Chicago; that Benjamin E. Minturn, a defendant, was connected with said appellees and aided and furthered the sales; that in June, 1937, Marks, Laser & Co. contracted to sell and sold to Crosby 100 shares of stock in the General Carpet Corporation for which he paid them the sum of $750; that at about the same time, the firm sold to Mickelberry 800 shares of said stock for the sum of $3000; and that in May, 1937, the firm sold to Hennessey 500 shares of said stock for the sum of $1875. It is alleged that this was done upon the solicitation of Minturn and that written memorandum confirming the orders was issued to each of the appellants. It is further alleged that the sales were in the course of a campaign to sell stock to the public generally; that this stock was sold by said firm at its Chicago office to appellants, who were residents of Illinois, and was delivered by the said partnership to the appellants through the mail; that the appellants received said certificates of stock in the city of Chicago through the United States mail either from the Chicago or New York offices of appellees. It is also alleged that

the securities were not of class A, B or C, but were class D and that they had not in any way been qualified under the Illinois Securities Law. The appellants asked for the respective amounts that they paid for said stocks and reasonable attorney's fees. The appellees filed their motions to strike the complaints and dismiss the action on the following grounds:

1. The complaints show on their face that the cause of action, if any, is against Minturn and not against the other defendants.

2. That such complaints failed to allege facts showing that the appellees "knowingly performed any act or in any way furthered the sale alleged to have been made to said appellants."

3. That the complaints show that the stock in question was delivered to appellants by United States mail; that the transactions were in interstate commerce and that the Securities Act of 1933 and the Securities Exchange Act of 1934 superseded the Illinois Securities Law and therefore no rights of recovery existed under the provisions of the Illinois statute. Upon a hearing of the motions, they were sustained by the court.

The paramount question in the case is the one raised by the third ground urged in behalf of the motions to strike. "By the passage in the Congress of the United States of the Federal Securities Act of 1933 and the Securities Exchange Act of 1934, have the Federal authorities occupied the field of regulation and control of transactions in securities both on stock exchanges and in over-the-counter markets in which the use of the mails is involved, and does the effect thereof cause a supersession of section 37 of the Illinois Securities Law as applied to the facts appearing in the amended complaints in this case?"

The described purpose of the Securities Act of 1933, U. S. Code, title 15, chap. 2A, sec. 77A-77AA, is to provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the

mails and to prevent frauds in the sale thereof. The chief reason for the passage of the act was that the State acts, commonly referred to as "Blue Sky Laws," were not adequate, due to the fact that a security dealer could sometimes successfully claim that his transactions were in interstate commerce and that the States could not regulate the same and thus avoid any regulation whatsoever. The main requirement of the act is that the issuer of securities sold or delivered through interstate commerce or the mails must, prior thereto, file a registration statement with the Securities Exchange Commission, stating information deemed appropriate by Congress. The commission must register any issue regardless of the security, where the registration statement is not on its face incomplete or inaccurate. The speculative nature of the enterprise is no ground for refusing the use of the mails or the channels of commerce for its sale. The act further requires that the distributors of these securities send to each investor a prospectus containing most of the information set forth in the registration statement. The commission is given the power to prescribe the form of the prospectus. Section 5 of the act further provides that unless a registration statement is in effect as to the security, it shall be unlawful for any person to make use of interstate commerce or the mails to sell or offer to buy such securities through the use of any prospectus or otherwise; to carry or cause to be carried through the mails or interstate commerce any such securities for the purpose of sale or for delivery after sale; to make use of the mails or interstate commerce to carry any prospectus which does not meet the requirements of section 10; and to use the mails or interstate commerce to carry any security for the purpose of sale or for delivery after sale unless accompanied or preceded by a prospectus that meets with the requirements of section 10.

In other words, any use of either interstate commerce or the United States mails at any time from the beginning of the negotiation for the sale of the security to the deliv-

542

ery of the security in consumation thereof, subjects the transaction to the regulation and control of the Securities Act of 1933. The act further provides certain civil and criminal liabilities for its violation.

The Securities Exchange Act of 1934, U. S. Code, title 15, chap. 2B, sec. 78A-78JJ, provides for the regulation of securities exchanges and over-the-counter markets operating in interstate and foreign commerce and through the mails, and its main purpose is to regulate the transactions by brokers and dealers with their customers. It also provides a civil remedy against a person who willfully participates in the manipulation of security prices, and provides a civil remedy for anyone suffering injury as a result of a misleading statement by a dealer or broker. The act also provides for criminal penalties for the willful violation thereof.

The Illinois Securities Law (Ill. Rev. Stat. 1941, chap. 121½, pars. 96-137,) provides that all dealers, brokers, solicitors and agents selling or offering for sale within the State are required to be registered with the Secretary of State in accordance with certain requirements. The Illinois law further provides that all securities shall be divided into six classes. Class A securities are exempt from the act by reason of their inherent qualities. Class B securities are exempt from the act by reason of the nature of the transaction in which they are sold. Securities based on established income constitute class C securities. The act provides for registration of investment contracts and investment trusts. Securities based upon prospective income constitute class D securities and may be sold only after strict compliance with certain registration and supervisory provisions of the law. The law provides that in certain cases the proceeds from the sale of class D securities must be deposited in escrow pending the sale of all of the particular issue and said proceeds can be released only upon certain requirements being met. The issuer of

securities is required to file with the Secretary of State an irrevocable power of attorney consenting that suits at law or in equity arising out of the sale of said securities may be commenced against the issuer in any court, in any county in which the plaintiff resides or in which the cause of action may have arisen, by merely serving the Secretary of State.

It is entirely possible that a security which the Securities Exchange Commission would authorize to be sold could not be sold in Illinois under the Illinois law. The Illinois law also provides a civil remedy under section 37 and provides criminal penalties for the violation of the law.

Both the Federal Securities Act of 1933 and the Securities Exchange Act of 1934 have been declared constitutional by the various Federal courts, and their constitutionality is not questioned in this proceeding. Appellees contend that Congress, by the exercise of its power to regulate interstate commerce, has evidenced its intention to occupy the entire field with respect to the business of dealing in securities, and that all power of the States to legislate with respect thereto and all existing State laws relating thereto have been superseded by the Federal statutes.

Both the Securities Act of 1933 and the Securities Exchange Act of 1934 have provisions which tend to preserve the rights of the States. Section 16 of the Securities Act of 1933 provides: "The rights and remedies provided by this subchapter shall be in addition to any and all other rights and remedies that may exist at law or in equity." (U. S. Code, title 15, chap. 2A, par. 77P.) Section 18 of said act provides: "Nothing in this subchapter shall affect the jurisdiction of the Securities Commission (or any agency or office performing like functions) of any State or Territory of the United States or the District of Columbia, over any security or any person." (U. S. Code, title 15, chap. 2A, par. 77R.) The Securities Exchange Act of 1934 provides in section 28(a) : "The rights and remedies

provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity * * *. Nothing in this title shall affect the jurisdiction of the Securities Commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this title or the rules or regulations thereunder." U. S. Code, title 15, chap. 2B, par. 78BB.

In addition to these provisions, the appellants rely upon the rule of law that the Federal acts do not supersede State acts unless such a construction is absolutely compelled from the Federal enactment. Many cases have been cited by both sides to this appeal and the decisions are numerous touching upon the question of exclusive Federal regulation and the consequent exclusion and effect upon State legislation. However, we believe that the recent case of *Cloverleaf Butter Co.* v. *Patterson, Comr.* 315 U. S. 149, 86 L. ed. 754, applies with particular force to the situation in this case. That case decided on February 2, 1942, has been discussed by both parties to this appeal and is relied upon heavily by the appellees. In that proceeding the Cloverleaf Butter Company brought an action against Patterson, the Commissioner of Agriculture, etc., of the State of Alabama, and others, to enjoin him from acting under an Alabama statute to determine the wholesomeness of renovated butter made from raw material in the hands of plaintiff, to inspect its raw material and plant, and to seize and detain plaintiff's packing-stock butter. The trial court and the circuit court of appeals both dismissed the suit. The United States Supreme Court reversed said rulings. The stipulation of facts showed that the Cloverleaf company obtained 25 per cent of its supplies of packing-stock butter from farmers and merchants in Alabama and 75 per cent thereof from other States and that of the finished product 90 per cent thereof was shipped in interstate commerce. The production of renovated butter is taxed and

regulated by the United States and also regulated by the State of Alabama. The Alabama officials had entered the Cloverleaf factory and had seized on many occasions a total of over 20,000 pounds of packing-stock butter, being the raw material. The question decided was, Does the inspection of the raw material in interstate commerce, used by the plaintiff in the manufacture of the finished product, made by the Secretary of Agriculture of the United States pursuant to the Federal laws, have the effect of excluding Alabama from inspecting or seizing the raw material in interstate commerce out of which the finished product to be sold in interstate commerce is made? The court held that the State was excluded on the ground that the action of the State would have a detrimental effect on the national regulatory policy declared by the Federal statutes. The court stated, at page 167, "The manufacture and distribution in interstate and foreign commerce of process and renovated butter is a substantial industry which, because of its multistate activity, cannot be effectively regulated by isolated competing States." It would appear that the Supreme Court, in the *Cloverleaf case,* has perhaps broadened its idea of the supersession of State laws by Federal laws. It should also be noted in the *Cloverleaf case* that there were provisions in the Federal law which were similar to the provisions in the Securities Act and Securities Exchange Act, involved here, by which the State laws were not expressly superseded.

In that case it was positively stated, "Where the United States exercises its power of legislation so as to conflict with a regulation of the State, either specifically or by implication, the State legislation becomes inoperative and the Federal legislation exclusive in its application." Recognizing this language of the United States Supreme Court, together with the provisions of article VI of the constitution of the United States stating that, "The Constitution, and the laws of the United States which shall be made in .

pursuance thereof * *· * shall be the Supreme Law of the Land," we agree with the statement by the United States Supreme Court with reference to article VI in the *Cloverleaf case, supra,* "Its application to individual cases creates difficulties."

Forty-seven States had securities laws in force at the time Congress passed the acts of 1933 and 1934, and if it had been the intention of Congress to supersede those State acts, we feel it would have been definitely expressed. There does not appear to have been any intention to supersede State regulations, because there is an express saving provision in both the 1933 and 1934 acts to that effect. In the present case the State law is more stringent than the Federal law in several respects and section 37, which is sought to be declared superseded, is the section which provides for a remedy to an investor who has been wronged in the violation of the Illinois act, which seemingly would be included in the saving provisions of sections 16 and 18 of the Federal Securities Act and section 28(a) of the Federal Securities Exchange Act, *supra.* The cases cited by appellees to the effect that the Federal act supersedes the State act, even in the face of said saving provisions, are not convincing nor controlling.

We fully agree with appellees that the power of Congress over the mails is at least as full and complete as its power over interstate commerce and identical principles of supersession operate when the postal powers of Congress are exercised as in the case of the exercise of its powers over interstate commerce. However, the cases cited by counsel were those involving interstate commerce. Here the transactions appear clearly to be local in character, and, with the exception of the mailing of the certificates, clearly intrastate. In the *Cloverleaf case* the business was almost wholly interstate. See also *Dickson* v. *Uhlmann Grain Co.* 228 U. S. 188, 53 S. Ct. 362.

In the cases cited by appellees there is a clear repugnancy between the State and Federal acts. In the present case there is no such repugnancy. In said cases there is also shown in the Federal acts involved, either by their text or by history of the legislation, the intention of Congress to supersede and occupy the field. No such intention appears in the case at bar.

In the *Cloverleaf case* the court said, "It has long been recognized that in those fields of commerce where national uniformity is not essential, either the State or Federal government may act," and "Where this power to legislate exists, it often happens that there is a partial exercise of that power by the Federal government. In such cases the State may legislate freely upon those phases of the commerce which are left unregulated by the nation," and further, "Our duty to deal with contradictory functions of State and Nation on any occasion and particularly when one or the other is challenged by private interests, calls for the utmost effort to avoid conclusions which interfere with the governmental operations of either."

We believe that the transaction in question was entirely local and in no sense could be termed interstate commerce; and that the use of the mails was purely incidental. All of the business was done at or through the Chicago office, and it would have been entirely possible for appellees to have delivered the certificates of stock to the purchasers in person at its office; and the use of the mails was therefore purely incidental. A holding that by such a method the Illinois act is avoided would permit the dangerous practice of every broker selling unqualified stocks in Illinois, by stepping over the State line to mail the stock to his customer to avoid any suit brought under the State act.

Because of this conclusion and the express saving clauses contained in the Federal acts, and because we do not believe the provisions of section 37 of the Illinois act are repugnant

to the Federal acts, we hold that, in this case, the latter legislation does not supersede the State statute.

Appellees have also challenged the sufficiency of the amended complaints because they do not allege that appellees had knowledge of the failure of the General Carpet Corporation to qualify its stock for sale in Illinois. Paragraph 6 of the complaint alleges that "all of the acts and things done and performed by defendants as herein alleged in connection with the sales of said stock to plaintiffs and in furtherance of such sales were knowingly done and performed by all of said defendants."

It is only necessary that the allegations state a cause of action. Section 42 of the Civil Practice Act, (Ill. Rev. Stat. 1941, chap. 110, par. 166,) provides: "2. No pleading shall be deemed bad in substance which shall contain such information as shall reasonably inform the opposite party of the nature of the claim or defense which he is called upon to meet." Under the Civil Practice Act, pleadings are to be liberally construed with the view toward doing substantial justice between the parties and no pleading is to be deemed bad in substance which shall contain such information as shall reasonably inform the opposite party of the nature of the claim. (*Frasier* v. *Finlay,* 375 Ill. 78.) With the adoption of the Civil Practice Act there has been a definite attempt to abolish the so-called technicalities of common-law pleading. It is our opinion that the complaint in the case at bar states a cause of action. If appellees desire the same made more definite and certain in any particular, the Civil Practice Act provides them with such a remedy.

The judgment of the trial court is reversed and the cause remanded for further proceedings not inconsistent with the views expressed in this opinion.

*Reversed and remanded, with directions.*