Joseph H. DUPLER, B. M. Roe, David I. Zinik and L. Howard Marcus, Plaintiffs,

v.

C. B. SIMMONS, individually, Edward Kellar, individually, and Simmons & Kellar, a partnership, Defendants.

Civ. No. 3839.

United States District Court
D. Wyoming.
July 15, 1958.

William H. Brown, Casper, Wyo., for plaintiffs.

J. J. Hickey (of Ellery, Gray & Hickey), Cheyenne, Wyo., and Paul T.

Liamos, Jr. (of Whitley & Liamos), New-castle, Wyo., for defendants.

KERR, District Judge.

Plaintiffs presumably concluding that they had made a bad investment filed this action seeking return of $62,000, same being the consideration paid for a fractional undivided working interest in a certain oil and gas lease located in Weston County, Wyoming.

The plaintiffs are all residents of Salt Lake City, Utah. The defendants are residents of Newcastle, Wyoming. The action arises under the Securities Act of 1933, as amended.

The complaint is in three counts, each based on a separate provision of the Securities Act. The first count is grounded upon alleged violations of the provisions of Section 5(a), 15 U.S.C.A. § 77e(a) and Section 12(1) 15 U.S.C.A. § 77l(1). The second count alleges violations of Section 12(2), 15 U.S.C.A. § 77l(2), and the third count avers violations of Section 17 (a), 15 U.S.C.A. § 77q(a).

Most of the material evidence in the case is not in dispute. A summary of the evidence is essential to an understanding of the issues involved and a proper application of the Act.

At the time the original negotiations were commenced by the parties, culminating in this action, the defendants were engaged in the oil and gas business as promoters and oil producers. The agreement and assignments constituting the subject of this controversy involved the sale and assignments by defendants to plaintiffs of a fractional undivided interest in oil and gas rights, commonly known as working interests, in a certain 40 acre tract in Weston County, Wyoming.

In March 1954 Maurice Yates, a resident of Salt Lake City, Utah, was carrying on certain negotiations with Simmons and during these negotiations discussed with Simmons the possibility of getting Dupler and others of Salt Lake City interested in purchasing a fractional undivided interest in an oil and gas lease which was then owned or held by Simmons. Following the Simmons and Yates negotiations Dupler and Marcus arrived in Newcastle on March 26, 1954. Yates introduced Simmons to Dupler and Marcus; Simmons advised Dupler and Marcus that he was the owner of a 75% working interest in an oil and gas lease covering a 40 acre tract; that he had a drilling commitment for a well to be drilled on the lease within 30 days; Simmons offered to sell a 50% working interest in the lease for $90,000; Dupler testified that Simmons advised him that if the Dupler group would buy the interest for $90,000 they could get their money back in not less than 3 months and not more than 18 months; that the well would produce 1,000 barrels of oil per day and perhaps as much as 2,000 barrels per day. Dupler further testified that Simmons represented that he owned a working interest in a 160 acre tract which he offered to sell the Dupler group for $200,000. Neither of the offers made by Simmons was accepted by Dupler and Marcus at the time.

At a later time during the same day another meeting was held with Simmons, Dupler and Marcus present; Dupler testified that Simmons stated he could secure a commitment to sell the oil at $2.40 or $2.50 per barrel, or a total of $2,400 per day; following this meeting Dupler and Marcus drove out to the field to inspect the 40 acre tract covered by the lease in question.

A third meeting was held on the afternoon of March 26, 1954, at which time Dupler, Simmons, Marcus, Yates and Kellar attended; Simmons introduced Kellar as his partner. At this meeting Simmons advised Dupler and Yates they should put up some money to show their "good faith". Dupler and Yates each gave Simmons his personal check for $5,-000 payable to Simmons and Kellar. The checks were subsequently returned to Dupler and Yates. The parties agreed that Dupler, Marcus and Yates would return to Salt Lake City and discuss the two proposals with Roe and Zinik and

would advise Simmons by telephone of the decision reached.

A few days later the plaintiffs and Yates met in the office of Zinik in Salt Lake City and discussed the proposition of purchasing the 50% undivided working interest in the 40 acre tract.

On April 1, 1954, the plaintiffs and Yates, not having reached a decision on the purchase of the interest, placed a call from Salt Lake City to Simmons in Newcastle, Wyoming. It is appropiate to quote the testimony of Marcus from the transcript of the record:

"A. Mr. Yates said, 'Tiny'—words to this effect—'Tiny', we are interested in the 40-acre deal, Section 34, and we—if we go into one, we prefer that to the 160-acre deal, but we think your price is too high. Would you go along at $75,000 instead of $90,000?' And then apparently—

"Q. No, not apparently, what did you next hear? A. Then Joe Dupler asked Maury Yates for the telephone and said, 'Let me talk to Mr. Simmons,' and Mr. Dupler took the telephone.

"Q. What did you hear Mr. Dupler say, without any surmising? A. Mr. Dupler said, 'We would like to take this 50 percent interest in the Section 34 lease, the 40 acres, but your price is too high. We can get a well drilled for less money, and we would go along for $75,000 but $90,000 is too high.' And then a little while later, 'No, eighty is still too high. Supposing we split the difference.' And then he said—then he asked us if we would go along, if we would agree to go on the basis of $77,500, and we all said yes, or nodded agreement.

"Q. When you say, 'He asked us if we would go along', to whom did he direct the inquiry? A. Mr. Zinik, Mr. Roe, Mr. Yates and myself.

"Q. Did he in that conversation give Mr. Simmons the names of those of you who were there? A. Yes, he later said, 'All right, we are agreed on this price.' Then he said, 'Now we will send—we will put up the money for the drilling portion only until you get to the sand, and then we will pay the completion money after you get to the sand. Where should we send the money?' And I heard him repeat back the First State Bank, Newcastle, Wyoming, and this was an amount $35,-000 originally. Then he said, we are dividing it up this way, ten percent for myself, ten percent for Howard Marcus, ten percent, I believe, for Maurice Yates, seven and a half percent for Dave Zinik, and twelve and a half percent, Ben Roe. That made a total of fifty percent.

\*      \*      \*      \*      \*

"Q. Now, following the time that the names and respective shares of the fifty percent were given over the phone by Mr. Dupler in that telephone conversation, did you hear anything else before the conversation was completed that you can recall?

\*      \*      \*      \*      \*

"A. Mr. Dupler said, 'Should we have the contract drawn here or will you send it to us?'

"Q. Did he say anything after that? A. Well, he said words to the effect, 'All right, we will have it drawn here and I will have my attorney draw it up, and we will send it to you for your signature, on the terms that we have discussed.'

\*      \*      \*      \*      \*

"Q. Now tell the Court the substance of your conversation over the telephone with Mr. Simmons that day. Just what all was said between you and Simmons. A. Well, as far as I can recall, the conversation was trying to—oh, yes. After we agreed upon a price, I think I said to him, 'You have the papers drawn up in Newcastle, send them down to Salt Lake City.' Well, he said, 'It would be much faster if you had your at-

torneys in Salt Lake City draw them up and then mail them up to me.' Which they were drawn up and sent to Newcastle.

"Q. Now, wait a minute, was anything discussed other than just the single figure, $77,500? A. Well, we discussed we was to pay I believe $45,000—

"Q. When? A. Should be given to the First State Bank.

"Q. Who designated that bank? A. Mr. Simmons.

"Q. What did he tell you about it? A. Well, that we should deposit, when we get this paper signed and everything, we should deposit about $35,000 in the First State Bank at Newcastle.

"Q. At Newcastle, Wyoming? A. Yes, sir.

"Q. What else was to be done? A. And—well, the papers were to be sent. Of course, the money wasn't sent until the papers were sent to him and he okayed them. Then we sent the money.

"Q. After Mr. Simmons had signed the agreement? A. Yes, sir.

* * * * *

"Q. And the only thing you absolutely recall definitely that you talked about was the price, is that correct? A. Well, there was a price, there was some other things, there's quite a few other things, such as—I am almost positive I mentioned what each one was buying. I think I gave him a list of the names of the people that was going in the company.

"Q. You are not positive of anything, but you know you talked about the price and had it reduced? A. Well, we had a—we had talked about the whole deal, the whole thing had to be ironed out on the telephone, the whole deal was transacted on the telephone, called for what it states in this contract, and that was the conversation evidently that was on the telephone, because—

"Q. Did you make any notes at that time? A. Sir?

"Q. At the time you were conversing with Mr. Simmons? A. I don't think so.

"Q. And you were the one who talked the entire deal over with Mr. Simmons, is that correct? A. In the presence of my associates."

Following the telephone conversation aforesaid Dupler proceeded to have his attorney in Salt Lake City draft an agreement pursuant to the telephone conversation in which Simmons agreed to convey a 50% interest in and to the oil and gas lease and cause a well to be drilled in accordance with the terms of the agreement. The agreement was executed by Dupler and Yates in Salt Lake City. It was delivered to Simmons in Newcastle, Wyoming, presumably by Yates. Simmons executed the agreement, together with copies thereof, and assignments of interest in the lease to each of the plaintiffs pursuant to the terms of the agreement. The proportionate share of each of the plaintiffs as contained in the agreement is as follows:

| To | Working Interest |
|---|---|
| J. H. Dupler, ........ | 10% |
| L. Howard Marcus, .. | 10% |
| B. M. Roe, .......... | 12½% |
| Dave Zinik, .......... | 7½%. |

On April 7, 1954, Simmons, in addition to the execution of the aforesaid agreement, executed the original assignments of the fractional undivided working interest in the 40 acre tract to each of the plaintiffs. The original assignments were delivered to the First State Bank of Newcastle, Wyoming, and the copies were handed to Yates for distribution to each of the plaintiffs in Salt Lake City. On April 10, 1954, Yates delivered the copies of the agreement and the copies of the assignments to Marcus in Salt Lake City and requested that he deliver to each plaintiff his copy.

On April 12, 1954, Yates mailed four checks totaling $29,750 to the First State Bank at Newcastle and authorized the bank to pay this sum to Simmons when

the well was drilled to a certain depth, the letter of transmittal being as follows:

"April 12, 1954

"First State Bank
Newcastle
Wyoming
"Gentlemen:

"The undersigned, Maurice Yates, and his associates have purchased from C. B. Simmons, of Newcastle, Wyoming, a 62½ per cent working interest in an oil and gas lease containing 40 acres located in Weston County, Wyoming, and described as follows:

Township 42 North, Range 66 West:

Section 34: SW¼ NE¼

"Under our agreement with Mr. Simmons, he has agreed to drill one well to a sufficient depth to test the Newcastle Sands and we have agreed to deposit with you in escrow the sum of $43,750 which you are authorized and directed to pay to Mr. Simmons when said well has been drilled through the Newcastle Sands and a Schlumberger electric log has been presented to you, and if a dry hole, when plugged and abandoned to the satisfaction of the United States Geological Survey.

"I am enclosing herewith a number of checks payable to your order totalling $43,750 and would appreciate your advising me that you are willing to act as escrow in accordance with the foregoing.

"Very truly yours,
Maurice Yates
1349 Normandie Circle
Salt Lake City, Utah"

On May 11, 1954, Simmons mailed statements to Marcus, Dupler and Zinik in the following language:

"May 11, 1954
"Mr. L. Howard Marcus
Salt Lake City, Utah
"Dear Mr. Marcus:

"This is your statement of the completion costs on the well just drilled in the NE¼ SW¼NE¼-34-42-66 Weston County, Wyoming as per agreement.
"Cost of Completion 10% W.I. $8500.00
"Yours very truly,
C. B. Simmons
Simmons & Kellar"

"May 11, 1954
"Mr. J. H. Dupler
Salt Lake City, Utah
"Dear Mr. Dupler:

"This is your statement for the completion costs on the well just drilled in the NE¼SW¼NE¼-34-42-66 Weston County, Wyoming as per agreement.
"Cost of Completion 10% W.I. $8500.00
"Yours very truly,
C. B. Simmons
C. B. Simmons & Kellar"

"May 11, 1954
"Mr. Dave Zinik
Salt Lake City, Utah
"Dear Mr. Zinik:

"This is the statement for the completion costs on the well just drilled in the NE¼SW¼NE¼-34-42-66 Weston County, Wyoming as per agreement.
"Cost of Completion 7½% W.I. $6375.00
"Yours Very Truly,
C. B. Simmons
Simmons & Kellar"

On May 25, 1954, Marcus mailed four checks to Cuba Hollaway totaling $34,000 and made payable to Simmons and Kellar and directed the checks be delivered to Simmons and Kellar for completion of oil well per agreement with Simmons and Kellar. Following the delivery of the checks to Simmons and Kellar Simmons delivered to Hollaway the executed original assignments for recording with the County Clerk of Weston County, Wyoming. After the recording the assignments were mailed to plaintiffs in Salt Lake City.

The parties agreed that no registration statement pursuant to Regulation "C" nor any Offering Sheet pursuant to Regulation "B" has ever been filed with the Securities and Exchange Commission.

The above constitutes a résumé of the undisputed evidence offered and received at the trial.

The question for determination in the first count of the complaint is whether the above transactions run counter to Section 5(a), 15 U.S.C.A. § 77e(a), and Section 12(1), 15 U.S.C.A. § 77*l*(1). If the answer is in the affirmative the

plaintiffs are entitled to rescind the contracts of assignments and recover the amounts paid by them.

The term "security" is defined in Section 77(b) (1) and expressly includes any "fractional undivided interest in oil, gas, or other mineral rights". That the defendants sold to plaintiffs a fractional undivided interest in an oil and gas lease is not in dispute. In Fisher v. Schilder, 10 Cir., 131 F.2d 522, at page 524, Judge Phillips speaking for the court said:

"Petitioner contends that the several counts of the indictment do not charge offenses against the United States. The argument is directed primarily to counts 1, 2, 3, and 4. The definition of the term 'security' in § 201 of the Securities Exchange Act of 1934, reads in part, 'fractional undivided interest in oil, gas, or other mineral rights.' 15 U.S. C.A. § 77b(1), 48 Stat. 905. Counsel for petitioner urge that the indictment charged entire interests in oil and gas leases rather than undivided interests. Count 1 of the indictment sets up an assignment of an oil and gas lease. The assignment purports to cover certain described acreage out of a community lease. The indictment alleges that it was represented that the assignment gave to the assignee a fractional interest in the community lease. It also charged as one of the securities involved fractional undivided interests in oil and gas royalties. What we have said respecting count 1 is likewise true of counts 2, 3, and 4. It follows, we think, that the indictment charged a security within the meaning of the Securities Exchange Act of 1934."

■ The purpose of the Securities Act of 1933 is to provide a full and fair disclosure of the character of securities sold in interstate commerce and through the mails and to prevent frauds in the sale thereof.

■ In short, the use of either interstate commerce or the United States mails at any time from the inception of the negotiations for the sale of the security to the delivery of the security is consummated subjects the transaction to the regulation and control of the Securities Act of 1933. See Crosby v. Weil, 382 Ill. 538, 48 N.E.2d 386.

The case of Blackwell v. Bentsen, 5 Cir., 203 F.2d 690, is closely in point. There plaintiffs purchased lands, usually in 20 acre lots, from a development company for the purpose of developing the tracts into citrus groves. There it was not contended that the mails had been used for the purpose of sending out advertising for the sale of the lands, but all deeds and contracts by which the transactions were consummated were returned by the seller to the purchasers through the mails. The court held that in their opinion this was a sufficient use of the mails to bring the case within Section 12(2) of the Act. The Court pointed out that the Act should be liberally construed to accomplish the legislative purpose in adopting it, which is to prevent the use of mails and other instrumentalities of interstate commerce in the perpetration of investment frauds.

It would be difficult indeed to distinguish the case at bar from the case of Wall v. Wagner, D.C., 125 F.Supp. 854. In that case the plaintiffs drove from Norfolk, Nebraska, to Lincoln, Nebraska, where they met Wagner and traveled with him to Madison, Kansas. There they were introduced by Wagner to Whitaker. On the same day Wagner and Whitaker took plaintiffs to different tracts of land, showing them oil wells with pumping station equipment in operation and stated the amount of production of such wells and other facts. That evening the parties returned to Eureka, Kansas, where plaintiffs were provided by defendants with a room in a hotel and were guests of the defendants for dinner that evening. Before noon the next day the parties went to the office of defendant Pay Rock Oil, Inc., and after some discussion plaintiffs signed an agreement authorizing Wagner to procure on their behalf a working interest in certain oil

properties. They entered into an agreement providing that plaintiffs would pay $3,000 plus an additional $1,500 for drilling expenses if oil was found on the leasehold. The plaintiffs also acquired an option to purchase a similar interest in another oil and gas lease. In connection with this transaction plaintiffs made out and delivered a check in the sum of $3,000 to Whitaker as payee. Plaintiffs returned to their home in Norfolk, Nebraska, without a copy of the agreement. A few days later plaintiffs wrote to the secretary of Pay Rock Oil, Inc., at Eureka, Kansas, for their copy of the agreement and it was forwarded to them through the mails. Shortly thereafter the contract was sent by mail from Eureka, Kansas, to plaintiffs at Norfolk, Nebraska. A statement in the amount of $1,500 for equipment and completion costs was sent through the mails. Plaintiffs remitted a check through the mails in the amount of $9,000. Under this set of facts the Eighth Circuit held that the transaction was in violation of the Securities Act and affirmed a judgment in favor of the plaintiffs. Whitaker v. Wall, 226 F.2d 868.

■ The defendants urge that the entire transaction purports to be an agreement between the parties for the joint development of the property; that the facts do not disclose the payment of money for assignments of interest but rather the payments of money for the development of the well, or the drilling of the well, and no part of the payment is designated as purchase price for any interest in the well.

Turning now to the agreement I find the language clear and explicit:

"1. First Party agrees to and does hereby sell, assign and convey to Second Parties an undivided fifty per cent (50%) working interest in and to a certain oil and gas lease dated January 26, 1951, between Thomas H. Bruce and Mabel S. Bruce, his wife, as lessors, and Union Oil Company of California, as lessee, recorded in Book 44, page

459, in the County Recorders Office in Weston County, Wyoming, covering the following described tract of land located in said Weston County, Wyoming:

Township 42 North, Range 66 West:

Section 34: SW¼ NE¼, containing 40 acres."

In oil and gas terminology it is not an uncommon method to sell fractional undivided interests in a lease to finance the drilling of a well. A reading of the entire agreement leads to but one conclusion, viz.: that Simmons intended to sell and did sell a fractional undivided interest in an oil and gas lease.

■ With respect to the Simmons and Kellar partnership, suffice it to say they held themselves out to the public as a partnership; Simmons introduced Kellar as his partner; the names appearing on the letterheads so indicate; some of the checks were made payable to them jointly; an examination of the exhibits and all the surrounding circumstances leads but to one obvious conclusion—that they were operating and dealt with the plaintiffs as partners and I so hold.

Section 77e of Title 15, in effect at the time of this transaction, provides:

"(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell or offer to buy such security through the use or medium of any prospectus or otherwise; or

"(2) to carry or cause to be carried through the mails or in interstate commerce, *by any means* or instruments of transportation, any such security for the purpose of sale *or for delivery after sale.*

"(b) It shall be unlawful for any person, directly or indirectly—

"(1) to make use of any means or instruments of transportation or

communication in interstate commerce or of the mails to carry or transmit any prospectus relating to any security registered under this subchapter, unless such prospectus meets the requirements of section 77j of this title; or

"(2) to carry or to cause to be carried through the mails or in interstate commerce any such security for the purpose of sale or for delivery after sale, unless accompanied or preceded by a prospectus that meets the requirements of section 77j of this title. May 27, 1933." (Emphasis supplied.)

Section 77l of Title 15, in effect at the time of this transaction, provides in part:

"Any person who—

"(1) sells a security in violation of section 77e of this title, or * * * shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security."

■ Here we are dealing with the following admitted state of facts: the terms of the agreement were all transacted by telephone conversations between Salt Lake City, Utah, and Newcastle, Wyoming; the agreement was transmitted from Salt Lake City to Newcastle and returned from Newcastle to Salt Lake City; the checks were mailed at Salt Lake City and delivered at Newcastle; the assignments of the undivided fractional interest in the lease were mailed from Newcastle to Salt Lake City. Under these circumstances it would appear that the defendants made use of interstate commerce in transporting and communicating the above documents and used the mails to transmit the delivery of both the assignments and the checks.

From what I have said I hold that the plaintiffs are entitled to rescind the securities and recover from the defendants as individuals and as a partnership the considerations severally paid by them, with interest thereon, less the amount of income, if any, received therefrom.

Having disposed of the action founded on count one of the complaint it is unnecessary to pass upon or decide counts two and three as the parties agree that if the plaintiffs are entitled to recover they can recover only upon one count of the complaint.

The plaintiffs will prepare findings of fact and conclusions of law, together with judgment, and submit the same within 20 days from and after the filing of this memorandum, and the clerk will enter an order accordingly.