WISDOM, Circuit Judge.
This appeal involves important issues relating to a state statute regulating corporate takeovers through tender offers. The plaintiff-appellee is Great Western United Corporation (Great Western), a publicly owned Delaware corporation.with its major executive offices located in Dallas, Texas. The principal officers, all directors, and the controlling shareholders of Great Western *1261 reside in Dallas. The defendant-appellant is Tom D. McEldowney, Director of the Idaho Department of Finance, charged with responsibility for enforcing the Idaho Takeover Statute, Idaho Code §§ 30-1501-13 (Cum.Supp.1977).[1]
Idaho, as well as thirty-one other states, regulates corporate takeovers through a tender offer.[2] This case presents questions whether the Idaho law, as McEldowney seeks to apply it here, may stand under the supremacy and commerce clauses of the United States Constitution and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq. (the 1934 Act), as amended by the Williams Act.[3] The basic questions applicable to all state takeover statutes have never been decided by a federal court of appeals.[4] Because this suit was brought in Texas, not Idaho, the case also raises novel questions of jurisdiction and venue. The district court determined that the prerequisites of personal jurisdiction and venue were satisfied. After a hearing on the merits, the *1262 court declared the Idaho statute unconstitutional because the 1934 Act preempts it and because it creates a burden on interstate commerce forbidden by article I, § 8, cl. 3 of the Constitution. Great Western United Corp. v. Kidwell, N.D.Tex.1977, 439 F.Supp. 420. McEldowney, joined by several states as amici,[5] strongly objects to all these rulings. We affirm the district court’s rulings that personal jurisdiction existed and that venue was proper. On the merits, we agree with the position of the Securities and Exchange Commission (SEC) that the Williams Act preempts Idaho’s takeover law because the state statute “presents a serious conflict with the administration of the federal program for the regulation of tender offers”. SEC amicus brief at 47. We also affirm the district court’s commerce clause ruling.
I.
FACTS
Sunshine Mining and Metal Co. (Sunshine) is a publicly owned company incorporated in the State of Washington. Its principal executive office and over fifty percent of its assets are located in Idaho. Sunshine has a wholly owned subsidiary with manufacturing facilities based in Maryland. In addition, Sunshine engages in significant business activities in New York. The shareholders of Sunshine live throughout the United States. Its securities are traded on the New York Stock Exchange. They are not registered in Idaho.
In March 1977, Great Western decided to make a tender offer for 2,000,000 shares of Sunshine common stock.[6] The tender offer of a net price of $15.75 a share was offered Sunshine shareholders across the United States. Because the tender offer was national in scope and the means and facilities of interstate commerce and the mails were necessary tools in making the tender offer, Great Western was required to comply with the provisions of the Securities Exchange Act of 1934 governing corporate tender offers.[7]
The Williams Act includes disclosure requirements, substantive restrictions on tender offers, and a general antifraud provision. It also confers broad rule-making authority upon the SEC.[8] The disclosure provisions of § 14(d)(1), 15 U.S.C. § 78n(d)(l), require specified information from any party making a tender offer which would result in that party’s ownership of more than five percent of a class of equity securities registered under the 1934 Act. That information includes the purchaser’s identity and background, the amount and source of the funds used for the purchase, the purpose of the purchase, any plans for liquidation, merger, or other significant changes in business or corporate structure of the target company, the number of shares the purchaser owns, and the details of any agreements with other parties concerning shares in the target corporation.[9]
On March 21,1977, Great Western filed a Schedule 13D with the SEC disclosing the *1263 information specified in the Williams Act.[10] The same day, Great Western publicly announced its intention to make a tender offer for 2,000,000 shares of Sunshine.
Had only the Williams Act regulated Great Western’s proposed tender offer, the offer would have commenced on March 21, 1977.[11] Idaho’s takeover statute, however, also applied to Great Western’s offer.[12] In addition, the laws of New York and Maryland arguably applied to the offer.
Idaho’s takeover law required Great Western, among other things, (1) to submit to the Director of the Idaho Department of Finance a preeffective filing disclosing Great Western’s intention to make a tender offer and the terms of the offer;[13] (2) to transmit, at the same time, a copy of that filing to Sunshine;[14] (3) to publish an advertisement describing the intention to make an offer and the proposed material terms;[15] (4) to pay the. Idaho registration fee;[16] (5) to participate in a hearing, which would be mandatory if Sunshine requested one;[17] and (6) to delay its tender offer until the final determination of any administrative or injunctive proceeding brought by the Director of Finance for violation of the Idaho takeover law.[18] No time limitation is placed on whether, or when, the director must rule on the effectiveness of a registration statement.[19] The director may summarily delay the effectiveness of an offer if he determines that the registration statement is insufficient.[20] Great Western’s offer would not have been subject to these requirements if the terms of the tender offer had been accepted by Sunshine’s board of directors.[21]
Idaho Code § 30-1503(1) states, in part, that “It is unlawful for any person to make a take-over offer involving a target company in this state, or to acquire any equity securities of a target company pursuant to the offer, unless the offer is effective under this chapter or is exempted by rule or order of the director”. As interpreted by the Idaho Department of Finance, this provision would prevent Great Western from making a tender offer to anyone in the world if it did not comply with the Idaho statute. Violations of the Idaho takeover law can result in criminal penalties of up to $5000 in fines and three years imprisonment.[22]
Great Western initially tried to comply with Idaho law. The company made informal inquiries about the Idaho requirements. On March 21, 1977, Great Western filed documents with the Idaho Commissioner of Finance in an attempt to satisfy Idaho’s statute. This was the first filing ever made under the Idaho takeover law. On March 25 Melvin Baptie, then the Director of the Idaho Department of Finance, wrote Great Western raising numerous objections to the *1264 disclosure Great Western had made and asking that amendments be made. He summarily ordered a delay of the effective date of the Idaho registration and the proposed tender offer. At about the same time, Great Western’s counsel in New York were advised by the New York Attorney General’s office that New York was “leaning” toward asserting jurisdiction over the offer for Sunshine. In Maryland, counsel for Great Western were informed that Maryland would not comment on the applicability of its takeover law without a hearing. At this point, therefore, Great Western was faced with the problem - of meeting the requirements of three state takeover statutes, each containing some provisions seemingly in conflict with the Williams Act.
Compliance with the state statutes on tender offers would have required Great Western to wait for New York and Maryland to rule on the applicability of their laws, to attempt to add the amendments proposed by Baptie, and to wait for the Idaho hearing and judicial review procedures to take place. To avoid this delay and also to avoid conflicting requirements, Great Western filed suit in the Northern District of. Texas, on March 28, 1977, against the state officials responsible for enforcing the Idaho, New York, and Maryland takeover laws.’ The suit sought an order declaring that the Idaho, New York, and Maryland -takeover acts were invalid insofar as they purport to apply to interstate cash tender offers for the purchase of securities traded on a national securities exchange. On April 1, 1977, the district judge issued a temporary restraining order directing the officials of the three states not to assert jurisdiction over the tender offer for Sunshine. The defendants sought emergency relief in this Court. On April 5, 1977, this Court stayed the TRO and directed the district court to make findings on personal jurisdiction and venue before deciding the merits of Great Western’s complaint.
After a hearing, the district court ruled that it had personal jurisdiction over the New York and Idaho defendants and that venue was proper. The district court dismissed the claim against the Maryland defendants because it concluded that Maryland had never demonstrated an actual and present intention to enforce its statute ■ against Great Western. The district judge refused to certify an interlocutory appeal from these rulings, and this Court denied a request by the defendants for a writ of mandamus. The case proceeded to a hearing on the merits in the district court. The trial judge issued his opinion, reported at 439 F.Supp. 420, on September 2, 1977. He dismissed the case against New York as moot because New York had informed Great Western in a letter dated May 20, 1977 that it would not assert jurisdiction over the Great Western tender offer for Sunshine. The district court held that the Idaho Takeover Act is preempted by the Williams Act and is in violation of the commerce clause of the United States Constitution. The court granted a declaratory judgment and injunctive relief against the Idaho officials, but stayed the effect of the order to permit the defendants to file an application for a stay of the judgment. This Court denied that application on September 16, 1977, but expedited hearing of this appeal.
The district court’s order, and a settlement of other litigation concerning the Great Western offer for Sunshine, allowed Great Western to acquire the desired Sunshine shares in the Fall of 1977.[23] Nevertheless, Idaho officials could take action if this Court were to reverse the district court. Idaho Code § 30-1509 would allow the officials to seek an appropriate injunction or to require rescission of the stock purchases. Despite its acquisition of 2,000,000 shares through its tender offer, Great Western does not have sufficient votes on the Sunshine Board to take advantage of the ex *1265 emption from the Idaho takeover law for offers approved by the target board of directors. Therefore, the issues before us are not moot.
II.
JURISDICTION OVER THE IDAHO STATE OFFICIALS

A. Subject Matter Jurisdiction.

The district court held that subject matter jurisdiction over Great Western’s challenge to the Idaho takeover law existed under 28 U.S.C. § 1331 (federal question cases), 28 U.S.C. § 1332 (diversity cases), 28 U.S.C. § 1337 (cases based on acts regulating commerce), and 15 U.S.C. § 78aa (Section 27 of the 1934 Act). On appeal, McEldowney explicitly protests only the lower court’s conclusion that Great Western’s complaint stated a claim under the 1934 Act and, implicitly, the conclusion that jurisdiction exists under § 1337. It is undisputed, therefore, that subject matter jurisdiction exists.

B. The Effect of Ex Parte Young.

It is hotly disputed whether a court in the Northern District of Texas could assert personal jurisdiction over the Idaho officials who enforced the Idaho takeover law. Initially, McEldowney contends that his status as a state official means that even though he may be sued under Ex Parte Young, 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714, he may not be sued outside Idaho without his consent. He reads Young narrowly, to strip state officials of their “state” status only to allow a suit under the Eleventh Amendment. For all other purposes, so he contends, this suit is against a state.
McEldowney emphasizes that Young was sued in his own state and argues that Young offers no support for the proposition that a state official suable under Young is to be treated as any other individual litigant. Although not challenging the validity of Ex Parte Young, the appellant labels its result a “fiction” and suggests that the fiction should not be allowed to become fantasy. There is nothing new about characterizing Young as a fiction, but usually it is termed a “necessary” fiction. L. Tribe, American Constitutional Law, 146 (1978). Ex Parte Young has become one of the cornerstones of our legal system. The Supreme Court recently refused to overrule or restrict the decision. Ray v. Atlantic Richfield Co., 1978, 435 U.S. 151, 98 S.Ct. 988, 994 n. 6, 55 L.Ed.2d 179. We see no reason, in policy or in the language of Justice Peck-ham’s opinion, to limit the effect of Young as Idaho’s Director of Finance asks us to do. The argument that Ex Parte Young leaves a state official with all the prerogatives of a state other than eleventh amendment immunity is undercut by the crucial paragraph in the decision:
If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character, and is subjected in his person to the consequences of his individual conduct. The state has no power to impart to him any immunity from responsibility to the Supreme authority of the United States.
209 U.S. at 159-60, 28 S.Ct. at 454 (emphasis added). See also Caldwell v. Sioux Falls Stock Yards Co., 1917, 242 U.S. 559, 37 S.Ct. 224, 61 L.Ed. 463. In that case the Court held that a suit challenging the South Dakota Blue Sky Law “manifestly is not one against the state”.
We read Young to say that a state official enforcing an unconstitutional statute is an individual defendant and nothing more. Under the reasoning of Ex Parte Young, the state has no interest in the lawsuit, for it is incapable of authorizing an unconstitutional act. 209 U.S. at 159, 28 S.Ct. 441; Scott, The Increased Control of State Activities by the Federal Courts reprinted in 3 Selected Essays on Constitutional Law 1077, 1084 (1938).[24] If so, the official gains no protection at all from his *1266 connection with the state on other matters. See Note, Sovereign Immunity in Suits to Enjoin the Enforcement of Unconstitutional Legislation, 50 Harv.L.Rev. 956 (1937). The dearth of previous cases where a state official has been sued outside his home state is probably attributable to the states having rarely, if ever, enacted statutes similar to the Idaho takeover law (and most other state takeover laws) that purport to extend a local official’s regulatory jurisdiction to other states. If, as Idaho contends through McEldowney, the federal system is involved, then that system compels Idaho to yield to the supremacy clause.

C. Personal Jurisdiction Under the Texas Long Arm Statute.

Under Federal Rules of Civil Procedure 4(d)(7) and 4(e), personal jurisdiction in diversity cases, federal question cases, and cases involving acts affecting commerce may, if necessary, be obtained through the long arm statute of the forum state. Wilkerson v. Fortuna Corp., 5 Cir. 1977, 554 F.2d 745, 747; 4 C. Wright & A. Miller, Federal Practice & Procedure §§ 1112, 1114 (1969). The Texas long arm statute, Tex.Rev.Civ.Stat.Ann. art. 2031b (Vernon), applies to individual as well as to corporate nonresidents. It authorizes assertion of personal jurisdiction over nonresidents to the limits of due process. Jetco Electronic Industries, Inc. v. Gardiner, 5 Cir. 1973, 473 F.2d 1228; Product Promotions, Inc. v. Cousteau, 5 Cir. 1974, 495 F.2d 483; U-Anchor Advertising, Inc. v. Burt, Tex., 1977, 553 S.W.2d 760.
The question is whether due process permits a court in Texas to exercise jurisdiction over the Idaho official who has enforced the Idaho takeover law to prevent a Texas-based corporation from proceeding with a national tender offer. We hold that it does.[25]
The framework for our due process analysis comes from seven Supreme Court cases: International Shoe Co. v. Washington, 1945, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95; Travelers Health Ass’n v. Virginia, 1950, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154; Perkins v. Benguet Consol. Mining Co., 1952, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485; McGee v. International Life Ins. Co., 1957, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223; Hanson v. Denckla, 1958, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283; Shaffer v. Heitner, 1977, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683; and Kulko v. Superior Court, 1978, - U.S. -, 98 S.Ct. 1690, 56 L.Ed.2d 132. See generally 2 J. Moore, Moore’s Federal . Practice H 4.25[2]-[4] (2d ed. 1974);- 4 C. Wright & A. Miller, §§ 1065-67. These cases establish that
the governing principle is the fairness of subjecting a defendant to suit in a distant forum. Only if the nonresident defendant has such “minimum contacts” with the state “that the maintenance of the suit does not offend ‘traditional notions of fair play and justice’,” International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), or if the defendant has performed some act “by which [it] purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,” Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); McGee v. International Life Insurance Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), may the forum, consistently with due process, extend its long arm to embrace it.
Jetco Electronic Industries, 473 F.2d at 1234; See also Product Promotions, Inc., 495 F.2d at 494. Of necessity, inquiries into whether the exercise of personal jurisdiction is permissible in a particular case are sensitive to the facts of each case. 2 J. Moore, 14.25[5] at 1172.
The appellant argues that all his activity took place in Idaho. “Minimum contacts”, however, need not arise from actual physical activity in the forum state; activities in other forums with foreseeable ef *1267 fects in the forum state will suffice. See, e. g., Wilkerson v. Fortuna Corp., 554 F.2d at 748; Product Promotions, Inc. v. Cousteau, 495 F.2d at 496; Travis v. Anthes Imperial Ltd., 8 Cir. 1973, 473 F.2d 515; Eyerly Aircraft Co. v. Killian, 5 Cir. 1969, 414 F.2d 591; Hitt v. Nissan Motor Co., Ltd., 1975 S.D.Fla., 399 F.Supp. 838, vacated on other grounds, 5 Cir. 1977, 552 F.2d 1088; Marico-pa County v. American Petrofina, Inc., 1971 S.D.Cal., 322 F.Supp. 467; 4 C. Wright & A. Miller § 1069. Very little purposeful activity is necessary to satisfy the minimum contacts requirement. Benjamin v. Western Boat Building Corp., 5 Cir. 1973, 472 F.2d 723, 726.
A corporation, of course, acts only through its directors and officers. When all of these directors and officers, as well as the major shareholders of the corporation, are located in Dallas at the time corporate decisions are made, the corporation is acting in Dallas. When the Idaho officials, through the Idaho takeover statute, asserted jurisdiction over the Great Western offer for Sunshine, they foreseeably caused efforts in Texas to comply with the Idaho state law. When the Idaho officials summarily delayed the effectiveness of Great Western’s tender offer for Sunshine, they foreseeably restrained a corporation in Dallas from proceeding with its plans. In other words, the Idaho officials regulated a corporation that acts in the Northern District of Texas and through that regulation foreseeably changed the corporation’s actions. These effects — effects with substantial consequences on important business plans — are more than sufficient to satisfy the minimum contacts requirement.
In Kulko v. Superior Court, - U.S. -, 98 S.Ct. 1690, 56 L.Ed.2d 132, 1978, the Supreme Court rejected an effort by a California court to assert personal jurisdiction over a non-resident on the basis of the effects his out-of-state conduct had in California. Kulko, however, does not change the basic approach to personal jurisdiction enunciated in prior Supreme Court decisions. It continues to recognize that the existence of personal jurisdiction turns upon the facts of each case. - U.S. -, 98 S.Ct. at 1694. The facts in Kulko are not so similar to the facts of Great Western that they control the outcome in our case.
The California court asserted personal jurisdiction (in a case concerning a separation agreement signed in New York) over a New York citizen solely because “by consenting to his children’s living in California [with his former wife], appellant had ‘caused an effect in th[e] state’ warranting the exercise of jurisdiction over him”. - U.S. at-, 98 S.Ct. at 1695, quoting 133 Cal.Rptr. 627, 628. The Supreme Court concluded that this effect was so insignificant that it was not reasonable for California to assert personal jurisdiction over the father. -U.S. at-, 98 S.Ct. at 1698-1699. It is not surprising that the Court found some effects are too insignificant to support personal jurisdiction; even physical contacts can be too insubstantial to establish personal jurisdiction. See-U.S. at -, 98 S.Ct. at 1698. That the subject matter of the underlying suit concerned domestic relations and child custody also influenced the Supreme Court’s evaluation of the reasonableness of California’s assertion of jurisdiction. The Court noted several times that Kulko’s children expressed the wish to live with their mother and that Kulko acted in his children’s best interest by honoring that preference. The Court expressed concern that a parent might hesitate to allow such moves if doing so would subject him to personal jurisdiction in a distant state. See, e. g.,-U.S. at-, -, 98 S.Ct. at 1698, 1699.
Kulko does not hold that a court considering an International Shoe question may not look to effects within the forum unless the defendant’s effect-producing activity causes physical injury within the forum state or affects the defendant’s commercial transactions within the forum state. Justice Marshall discussed those factors to support his conclusion that the effect in Kulko could not support personal jurisdiction in California. He did not establish new general restrictions on the use of the effects test in the application of International Shoe.
The effects felt in Texas as a result of Idaho’s regulation of Great Western’s tender offer were more substantial than *1268 those felt in California when Kulko allowed his children to join their mother. Idaho’s out-of-state regulation had the direct effect ■of stopping a substantial commercial venture based in Texas. hf° other state had a greater connection with that venture than Texas. In contrast, New York had more extensive connections than California with the separation agreement at issue in Kulko. Idaho’s “business” is .to regulate. It was conducting that business in Texas. Our case, therefore, is more analogous to an insurer’s sending an insurance contract and premium notices into a state to an insured resident of the state than to the domestic controversy between Kulko and his former wife. Compare McGee v. International Life Insurance Co., 1957, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 with Kulko v. Superior Court,-U.S. at-, 98 S.Ct. at 1699. One could also analogize the actions of Idaho’s officials to the tort of intentional interference with a commercial relationship. See W. Prosser, Handbook of the Law of Torts, § 129 (4th ed. 1974). The absence in our case of the family consideration stressed by the Kulko Court also distinguishes the Supreme Court’s recent decision.
McEldowney protests that Great Western came to him with its voluntary filing of March 21, 1977. It is true that unilateral activity by the plaintiff cannot produce the minimum contacts necessary to satisfy due process. See Hanson v. Denckla, 357 U.S. at 250-53, 78 S.Ct. 1228; 4 J. Moore 14.25[5]. “[W]e have, nevertheless, unequivocally required some activity by the defendant . . . ” Benjamin v. Western Boat Building Corp., 472 F.2d at 726 (emphasis in original). In Hanson v. Denckla, a Florida court asserted jurisdiction over a Delaware Trust Company. The only connection asserted between the Company and Florida occurred because the trustee, who had created the trust in Delaware, moved to Florida where she received some trust income and engaged in various acts of trust administration. The Trust Company had nothing to do with the trustee’s decision to move. The case before us is different. It may be true that Great Western came to Idaho with a filing. It is also true that Great Western had little choice; the alternative for its officers was to risk criminal penalties under Idaho Code 30-1510. The first step in the sequence came not from Texas, but from Idaho, where the filing requirement binding on Great Western was created. Furthermore, Idaho’s regulatory activities after the filing, including the order delaying the effectiveness of the tender offer, constituted affirmative action by Idaho officials causing foreseeable effects in Texas. The decision to issue a regulatory order having inevitable extraterritorial effects cannot be compared with the routine remission of trust receipts to a trustee who has moved to another state.[26]
McEldowney stresses language from Hanson v. Denckla that “it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws”. 357 U.S. at 253, 78 S.Ct. at 1240. The Idaho official denies that he did such an act.
Judge Goldberg, after a thorough study of the Supreme Court cases, concluded that this language “should not be read too literally” and that essentially it reflects the Court’s rule that unilateral action by the plaintiff cannot create the necessary relationship between the defendant and the forum state. Product Promotions, Inc. v. Cousteau, 495 F.2d at 496.[27] Personal jurisdiction has been found to exist over price *1269 fixing conspirators whose illegal activities in one state were designed to control prices in the forum state. Hitt v. Nissan Motor Co., Ltd., 1975 S.D.Fla., 399 F.Supp. 838, vacated on other grounds, 5 Cir. 1977, 552 F.2d 1088; Maricopa County v. American Petrofina, Inc., 1971 S.D.Cal., 322 F.Supp. 467. Those conspirators, of course, had not invoked the benefits and protections of the forum states’ laws in a restrictive sense.
Even if we were to read the requirement of Hanson v. Denckla more literally, it would be satisfied in this case. The activities of the defendant officials were to regulate tender offers. The impact of their regulation was felt in Texas, as they intended it to be. Thus, they did conduct activities in Texas. If Great Western had failed to comply with the Idaho takeover law, and the Idaho officials had obtained criminal sanctions, no doubt the state officials would have expected Texas to honor those criminal judgments. Indeed, if the Texas courts did not, the sanctions might have little effect since none of Great Western’s officers reside in Idaho. Idaho might also ask for Texan help if violators of the takeover residing in Texas refused to go to Idaho for trial. Idaho was depending, at least in part, upon Texan cooperation to make its enforcement mechanism effective.[28]
The most fundamental difference between the dissenting and majority opinions in this case arises over the requirement of the Supreme Court cases that an assertion of personal jurisdiction not “offend traditional notions of justice and fair play”. Questions of reasonableness are invariably ones of judgment where “[t]he greys are dominant and even among them the shades are innumerable”. Kulko v. Superior Court, - U.S. at -, 98 S.Ct. 1695, 1697. In its evaluation, the dissent gives too little emphasis to the uniqueness of the state takeover laws. Idaho’s statute seeks to regulate the sale of a security even when neither the buyer nor the seller nor the sale itself has any connection with Idaho. See generally Shipman, Some Thoughts About the Role of State Takeover Legislation: The Ohio Takeover Act, 21 Case Wes.Res.L. Rev. 722, 756 (1970). The Idaho officials deliberately cast their regulatory net across the United States. They knew those regulations would entangle transactions with no connection to Idaho. It is not unfair or unreasonable to require an Idaho official to travel from his home when one of the participants in a non-Idaho transaction challenges the constitutionality of Idaho’s interference. Although the Idaho officials may have been inconvenienced by the need to appear in Texas, they had ample resources to do so.
The state officials and the dissent argue that it is unreasonable for a court in Dallas to assert personal jurisdiction over the defendants in this case because doing so will lead to numerous other out-of-state suits against state officials who enforce other state regulations with interstate impact. *1270 One paragraph, in particular, of the district court’s memorandum order disturbs McEl-downey:
The practical effect of the Idaho defendants’ actions is to regulate business activities of Great Western-and the investment opportunities of shareholders of . Sunshine in Texas and every other state. The court does not therefore find it unfair to make the Idaho defendants appear where the predictable, consequences of their purposeful actions are felt.
439 F.Supp. at 433 (footnote omitted). McEldowney reads this paragraph to mean that personal jurisdiction over a state official is reasonable and proper whenever the statute he enforces has a “practical effect” in a forum state.
This would, indeed, be an expansive construction. We consider this to be an unfair reading of the district court’s opinion; nor is such a holding necessary to justify personal jurisdiction in this case. In our view, the crucial conclusion in the quoted paragraph is not that the actions of the Idaho defendant under the Idaho takeover law had a “practical effect” in Texas, but that they amounted to the regulation of Great Western’s Texas-based business activities. Because we have concluded that this extraterritorial regulation provides the necessary contacts with Texas, we need not rely upon the district court’s further and broader conclusion that impact on shareholders also provides the contacts necessary to satisfy due process.
The contention that our holding will permit countless other out-of-state lawsuits against state officials ignores the concededly unique characteristics of state takeover laws such as Idaho’s. We do not share the dissent’s difficulty distinguishing the Idaho takeover statute from other regulations. In none of the examples it cites is there a comparable lack of any connection between all parties to a transaction, as well as the transaction itself, and the regulating state. For instance, it is true that the California pollution law impacts out-of-state automobile manufacturers. But it is also true that almost all the customers who buy and drive those cars are California residents. Blue Sky laws — in notable contrast to the Idaho takeover law — regulate only sales of securities within the regulating state. Insurance laws’ have a similarly limited scope. Business qualification regulations affect only companies that wish to operate within the regulating state. And food purity laws cover only sales of food to customers within the regulating state. When, as in these examples, the regulating state has a substantial connection with at least one side of a regulated transaction, it may be unreasonable to require state officials to defend their regulations in out-of-state forums even though there are foreseeable effects in a foreign state sufficient to satisfy the minimum contacts branch of International Shoe’s requirements. That, however, is simply not the situation in this case.

D. Section 27 of the 1934 Act.

Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1970), provides in relevant part:
Any criminal proceeding [under the Act] may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found.
Under the final clause, a federal court has jurisdiction over the person of a defendant in an action under the 1934 Act so long as the manner of service is proper and constitutional limits on extraterritorial service are respected. A. L. Black v. Acme Markets, Inc., 5 Cir. 1977, 564 F.2d 681.
The manner of service is not contested on appeal; we have already held that any constitutional limits on extraterritorial service have been respected.[29] If Great Western’s *1271 complaint states a claim under the 1934 Act, § 27 provides another basis for personal jurisdiction.
Section 28 of the 1934 Act, 15 U.S.C. § 78bb (1970) is helpful to Great Western. That section provides in relevant part:
Nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.
This language impliedly prohibits a state official from enforcing a statute that conflicts with the 1934 Act. Great Western’s claim that the Idaho takeover law conflicts with the Williams Act, therefore, appears to state a claim under § 28.
McEldowney responds that the only possible claims under the 1934 Act are those to prevent and punish fraud in the purchase and sale of securities. Section 28 prohibits no conduct; to the contrary, it preserves the right of states to regulate. Finally, he argues that Great Western’s construction of § 28 would mean that by enforcing the Idaho takeover law the state officials “violated” the 1934 Act and became subject to criminal penalties under § 32, 15 U.S.C. § 78ff(a) (1970).[30] Since Congress could not have intended to make such conduct criminal, McEldowney concludes that enforcement of a law that conflicts with the 1934 Act cannot be a violation of that Act, and that § 28 is not relevant to this proceeding. Great Western’s contention, he argues, is one under the supremacy clause of the Constitution, not under the 1934 Act.
The attempted distinction between § 28 and the supremacy clause is not persuasive. Section 28 essentially restates the supremacy clause, making it a statutory as well as a constitutional requirement. See Aranow, Einhorn & Berlstein, Developments in Tender Offers for Corporate Control 225 (1977). Thomas Corcoran, one of the principal draftsmen of the 1934 Act, pointed out to the Senate Committee on Banking and Currency that § 28 stated a rule that is true of any federal statute because of constitutional requirements. Senate Committee on Banking and Currency, Stock Exchange Practices: Hearings on S. Res. 84 (72d Cong.) and S. Res. 56 and S. Res. 97 (73d Cong.), pt. 15, National Securities Exchange Act of 1934, 73d Cong., 1st Sess. 6577 (1934). Nor is the lack of prohibitory language in § 28 significant. The commerce clause, for instance, is written only as an affirmative grant of power to Congress. Without any difficulty, courts find that the language also imposes self-executing limitations on regulation by the states. E. g., P. Brest, Processes of Constitutional Decisionmaking 206 (1975). Finally, the absence of previous cases relying upon § 28 to invalidate a state law is not controlling. As we have already noted, the state takeover laws pose highly unusual, if not unique, questions in the subject of securities regulation.
To interpret § 28 to require states not to enact or enforce laws that conflict with the 1934 Act and to hold that § 27 applies to a suit to enforce that requirement is not to subject officials of states with offending statutes to the risk of imprisonment or fine. McEldowney argues that “violation” is the key word in § 27, and that an act that is a “violation” in § 27 terms is automatically within the scope of § 32(a) criminal liability. The SEC, in oral argument, suggested that a suit based on § 28 would be one to enforce a duty created by the 1934 Act and that the concept of a “violation” would not be relevant.
*1272 It is not necessary to parse § 27 to determine if this distinction between a “violation” of the 1934 Act and a failure to honor a “duty” created by the Act is valid.[31] Even if “violation” is the key word in § 27, that word has not been interpreted in the manner urged by Idaho’s Director of Finance. The most helpful authority comes from § 16(b) cases.
Section 16(b), 15 U.S.C. § 78p(b) (1970), allows a corporation to recover any profit realized by a corporate insider from short swing trading in the corporation’s stock.[32] Nothing in the 1934 Act directly forbids short swing trading by insiders. Instead, such an obligation has been inferred from the profit recapture provision. E. g., Gratz v. Claughton, 2 Cir. 1951, 187 F.2d 46, 49 (L. Hand, J.), cert. denied, 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353. Short swing trades are not made unlawful by § 16(b) in the sense that they can result in an indictment. II L. Loss, Securities Regulation 1044 (1961). Nevertheless, engaging in short swing trading is a “violation” for § 27 purposes. Gratz v. Claughton, 187 F.2d at 49; Grossman v. Young, 1947 S.D.N.Y., 70 F.Supp. 970, petition for prohibition and' mandamus denied sub nom. Young v. Rifkind, 2 Cir., Oct. 13, 1947.
Enforcement of a duty not to make short swing trades fulfills the purpose of § 16(b). Gratz v. Claughton, 187 F.2d at 49. Similarly, recognition of a duty not to pass or enforce laws that conflict with the 1934 Act would fulfill the purposes of § 28. Like the duty not to make short swing trades, this duty would not be enforceable through criminal sanctions, but could be violated for purposes of § 27.
We conclude that the wording of § 28 and the legislative history of the 1934 Act show that § 28 was an attempt to incorporate the supremacy clause into the securities laws. Congress, of course, is free to do this. We hold that Great Western stated a claim based on the 1934 Act, and that § 27 is an independent source of personal jurisdiction over the Idaho officials.
III.
VENUE

A. The 1934 Act.'

Section 27 of the 1934 Act provides for venue as well as personal jurisdiction. Venue is proper in any district where acts constituting part of the alleged violation of the 1934 Act occurred. The alleged violation consists of enforcing an invalid statute. The regulatory activities by the Idaho officials had their restraining effect at the corporate headquarters of Great Western in Dallas. This was a sufficient act to make venue proper in the Northern District of Texas. See Travis v. Anthes Imperial Limited, 8 Cir. 1973, 473 F.2d 515. In addition, Idaho officials sent at least one interstate letter into Texas as part of their regulatory efforts. The letter from Baptie outlining his objections to Great Western’s filing and announcing that the effective date of the offer would be summarily delayed was more than a trivial part of the interference by Idaho officials with Great Western’s securities transactions. Such interstate communication into the forum makes venue proper under § 27. See, e. g., Hilgeman v. National Insurance Co., 5 Cir. 1977, 547 F.2d 298; Mayer v. Development Co., 1975 D.Del., 398 F.Supp. 917.

*1273
B. 28 U.S.C: § 1391(b).

Because subject matter jurisdiction in this case is not based solely upon diversity of citizenship, the applicable general venue statute is 28 U.S.C. § 1391(b).
A civil action wherein jurisdiction is not founded solely on diversity of citizenship may be brought only in the judicial district where all defendants reside, or in which the claim arose, except as otherwise provided by law.
The district court followed the rule that a claim can arise in only one district for § 1391 venue purposes. It held that for § 1391 purposes the claim arose in Idaho, and that venue was not proper under the general statute. 439 F.Supp. at 433. We disagree.
The language of 28 U.S.C. § 1391 can be read to provide that a claim may arise, as a matter of law, in only one district. See, e. g., 15 C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure: Jurisdiction § 3806 at 28-29 (1976). Commentators have recognized, however, that a preferable approach would be to equate the availability of compulsory process on a nonresident and proper venue under § 1391. Id. at 29; 1 J. Moore 10.142[5. — 2] at 1430. Professor Moore’s.view is that the current statute can be read to follow such an approach, although he admits this reading is not without difficulty. 1 J. Moore H 0.142[5. — 2] at 1431-32. Some courts have moved toward an expansive reading of § 1391. See, e. g., Gardner Engineering Corp. v. Page Engineering Co., 8 Cir. 1973, 484 F.2d 27, 33; Carter-Wallace, Inc. v. Ever-Dry Corp., S.D.N.Y, 1968, 290 F.Supp. 735, 739; 15 C. Wright, A. Miller & E. Cooper § 3806 at 29 n. 18; 1 J. Moore 10.142[5. — 2] at' 1433. Our conclusion that the Idaho officials had sufficient contacts with the Northern District of Texas to make compulsory process available means that venue would be proper under § 1391(b) if the expansive interpretation of the venue statute is adopted.
We may leave that decision for another day, because even if Great Western’s claim can arise in only one district, we conclude that the proper district is the Northern District of Texas, not the District of Idaho.[33] The core of Great Western’s claim is that the Idaho officials invalidly prevented Great Western from initiating a tender offer for Sunshine. The offer was initiated in Dallas, Texas. If there is a single place where the allegedly invalid restraint occurred, that place is Dallas.[34] Although the result of Idaho’s regulation was that Great Western could not make an offer to Sunshine shareholders who reside in districts throughout the country, the place of restraint, and thus the place where Idaho officials injured Great Western, was in Dal- • las.[35]
That the Northern District of Texas is the district where the claim arose, if there can be only one such district, becomes clearer if one notes that New York and Maryland also might have asserted jurisdiction over Great Western’s offer. In that event, there would have been no district where all the defendants resided. The apparent purpose of the amendments to § 1391, adding the “in which the claim arose” language, was “to assure that at least one venue . . . will be proper as to all defendants . in a multi-party action”. 1 J. Moore 1 0.142[5. — 2] at 1434 (emphasis add *1274 ed). There is no reason to conclude that the claim against New York or Maryland arose in Idaho. The district judge would have placed the claim in Idaho only because Idaho was the source of the power exerted extraterritorially. Idaho would not have been the source of New York’s or Maryland’s power. In contrast, if New York or Maryland officials had asserted jurisdiction, the reasons why we believe Great Western’s claim against the Idaho officials arose in Dallas would equally apply to them, and a single suit would have been possible.
In summary, on the questions whether the requirements of personal jurisdiction and venue are satisfied, we hold that both are met.[36] Personal jurisdiction existed under the Texas long arm statute, as made applicable by the Federal Rules of Civil Procedure, and the requirements of due process. Personal jurisdiction also existed by virtue of § 27 of the 1934 Act. Venue is proper under both § 27 of the 1934 Act and 28 U.S.C. § 1391(b).[37]
IV.
PREEMPTION

A. The Legal Criteria.

We now proceed to the district court’s substantive holding that federal securities regulation preempts the Idaho statute.
No simple, mechanical formula can summarize the analysis necessary to determine whether a state statute is void under the supremacy clause, U.S.Const. art. I, § 10. See Goldstein v. California, 1973, 412 U.S. 546, 561, 93 S.Ct. 2303, 37 L.Ed.2d 163; Hines v. Davidowitz, 1941, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581, The nature of a court’s inquiries as to this question has been established in earlier cases. The Supreme Court summarized these inquiries in Jones v. Rath Packing Co., 1977, 430 U.S. 519, 525-26, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604:
The first inquiry is whether Congress, pursuant to its power to regulate commerce, U.S.Const., Art. 1, § 8, has prohibited state regulation of the particular aspects of commerce involved in this case. [W]hen Congress has “unmistakably . . . ordained,” Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. This result is compelled whether Congress’ command is explicitly stated in the statute’s language or implicitly contained in its structure and purpose. City of Burbank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973); Rice v. Santa Fe Elevator Corp., 331 U.S. [218,] 230, 67 S.Ct. 1152, [91 L.Ed. 1447] [1947].[38]
Congressional enactments that do not exclude all state legislation in the same field nevertheless override state laws with which they conflict. U.S.Const., Art. VI. The criterion for determining whether state and federal laws are so inconsistent that the state law must give *1275 way is firmly established in our decisions. Our task is “to determine whether, under the circumstances of this particular case, [the state’s] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 339, 404, 85 L.Ed. 581 (1940). Accord, De Canas v. Bica, 424 U.S. 351, 363, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976); Perez v. Campbell, 402 U.S. 637, 649, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); Florida Lime & Avocado Growers v. Paul, supra, at 141, 83 S.Ct. at 1217; id. at 165, 83 S.Ct. at 1229 (White, J., dissenting). This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written. See De Canas v. Bica, supra, 424 U.S. at 363-365, 96 S.Ct. at 940-941; Swift & Co. v. Wickham, 230 F.Supp. 398, 408 (S.D.N.Y.1964), appeal dismissed, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965), aff’d on further consideration, 364 F.2d 241 (CA 2 1966), cert. denied, 385 U.S. 1036, 87 S.Ct. 776, 17 L.Ed.2d 683 (1967).
Nothing in the 1934 Act explicitly preempts all state takeover legislation; indeed, § 28 has a contrary tone. We need not reach the question whether Congress implicitly ruled out all state legislation of tender offers when it amended the 1934 Act with the Williams Act. We rely instead on the principles in the second paragraph quoted from Jones, and hold that the particular takeover law before us cannot stand because it conflicts with the federal statute. In the words of Hines, “it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress”.
McEldowney relies heavily on the words of § 28 to argue that the Idaho statute is not preempted. This argument applies to both the supremacy clause and to § 28, in that § 28, according to McEldowney, is an express congressional instruction on how. to apply the supremacy clause. Appellant’s brief at 29-30. This'analysis, like ours, focuses on the question whether the Idaho statute “conflicts” with the Williams Act. McEldowney argues further, however, that a “conflict” in this context exists only if it is impossible to meet both federal and state requirements. Because of this he argues flatly that “[t]he test set out in Hines is not relevant”. Appellant’s brief at 30.[39]
We do not accept this narrow definition of “conflict”, nor the dismissal of the Hines test. Therefore, although several provisions of the Idaho statute arguably contradict specific provisions of the federal law, we shall not focus on those inconsistencies nor decide whether they would be sufficient to preempt Idaho’s law under McEldow-ney’s suggested analysis.[40]
*1276 The appellant’s definition of “conflict” is too narrow for the usual preemption test; Jones unambiguously reaffirms that in general the Hines test rather than a more limited examination for contradictions is the proper one. Jones v. Rath Packing Co., 430 U.S. at 526, 97 S.Ct. 1305. Nor does any reason appear to give the term “conflict” a special limited meaning in § 28 of the 1934 Act. The language of the section does not compel such unusual interpretation. The cases and administrative authorities cited in the appellant’s brief at best support the narrow definition obliquely, and all are in distinguishable contexts.[41] The SEC, in its role as an amicus curiae in the case, rejects such a narrow reading, SEC amicus brief at 45-47. This administrative interpretation is entitled to deference. See Fawcus Machine Co. v. United States, 1931, 282 U.S. 375, 51 S.Ct. 144, 75 L.Ed. 397; Hart & Sacks, The Legal Process: Basic Problems in the Making and Application of Law 1340-47 (tent. ed. 1958); Note, Preemption as a Preferential Ground: A New Canon of Construction, 12 Stan.L.Rev. 208, 216-17 (1959). Finally, the legislative materials discussed in Part III of this opinion show that the draftsmen of § 28 intended to restate the supremacy clause. That being so, there is no reason to substitute a narrow meaning of “conflict” for that enunciated by the Supreme Court in Hines, Jones, and other cases.

B. The Conflict Between the Idaho Takeover Statute and the Williams Act.

The underlying purpose of the Williams Act is to protect investors. Piper v. Chris-Craft Industries, Inc., 1977, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124. Congress chose this goal in the Williams Act and adopted a distinct means of achieving it. Essentially, Congress relied upon a “market approach” to investor protection. The function of federal regulation is to get information to the investor by allowing both the offeror and the incumbent managers of a target company to present fully their arguments and then to let the investor decide for himself.[42] In identical language *1277 the Senate and House Reports explained, “This bill is designed to make the relevant facts known so that shareholders have a fair opportunity to make their decision”.[43] In Rondeau v. Mosinee Paper Corp., 1975, 422 U.S. 49, 58, 95 S.Ct. 2069, 45 L.Ed.2d 12, the Supreme Court noted that Congress wanted to give each side an opportunity to express and explain its position without giving target management a weapon against takeover bids. See also, Humana, Inc. v. American Medicorp., Inc., S.D.N.Y.1978, 445 F.Supp. 613.
The reason for this approach was congressional recognition that tender offers often benefit an investor and that a statute preventing tender offers could harm, rather than protect, investors. E. g., S.Rep.No. 550, 90th Cong., 1st Sess. at 3 (1967) (Senate Report); H.R.Rep.No.1711, 90th Cong., 2d Sess. at 3 (1968) (House Report); U.S.Code Cong. & Admin.News 1968, p. 2811. The original bill to amend the 1934 Act, S. 2731, introduced in 1965, sought to protect investors by making it difficult for tender offers to succeed. See 111 Cong.Rec. 28257-28259 (1965).[44] This approach attracted considerable opposition, including that of the SEC.[45]
As a result, Congress amended the draft bill to make it less burdensome to offerors. A cornerstone of the revised approach to investor protection was the law’s deliberate neutrality among the contestants in a tender offer. The Senate Report explained:
The committee has taken extreme care to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid. The bill is designed to require full and fair disclosure for the benefit of investors while at the same time providing the offeror and management equal opportunity to fairly present their case. Senate Report at 3. Virtually identical language appears in the House Report at 3. The Supreme Court has already drawn attention to this language and to the intent of Congress not to take sides in tender offers. Piper v. Chris-Craft Industries, Inc., 430 U.S. at 30-31, 97 S.Ct. 926; Rondeau v. Mosinee Paper Corp., 422 U.S. at 58-59, 95 S.Ct. 2069.
Of course, this language does not mean Great Western has a right under the Williams Act to complete its tender offer successfully. See Piper v. Chris-Craft Industries, Inc., 430 U.S. at 34-35, 97 S.Ct. 926. Instead, it creates the investor’s right to hear a fair presentation of the offeror’s proposal. This investor’s right can be carried out, however, only by avoiding regulation that puts the offeror at a disadvantage to incumbent management. Congress recognized that delay can seriously impede a tender offer. Senate Report at 5. It rejected legal requirements, such as pre-commencement review by the SEC, that could delay offers unnecessarily. Id. Such delay could prevent the offeror from fairly presenting its case.
In its consideration of the Hart-Scott-Ro-dino Antitrust Improvements Act of 1976, 15 U.S.C.A. § 18a (Supp.1977), Congress recently reaffirmed the choice of a market approach to investor protection in the tender offer area, as well as the importance of legal neutrality between offerors and incumbent management to carry out this protection. Congress also reaffirmed its view that regulatory provisions producing more than minimal delay could upset this neutrality. The House Report stated:
it is clear that this short waiting period [referring to the 10 days required by the Williams Act] was founded on congressional concern that a longer delay might *1278 unduly favor the target firm’s incumbent management and permit them to frustrate many pro-competitive cash tenders. This 10-day waiting period, thus underscores the basic purpose of the Williams Act — to maintain a neutral policy toward cash.tender offers, by avoiding lengthy delay that might discourage their chances for success.
H.R.Rep.No.94-1373, 94th Cong., 2d Sess. 12 (1976); U.S.Code Cong. & Admin.News 1976, pp. 2572, 2644. Congressman Rodino explained to the House:
Lengthy delays will give the target firm plenty of time to defeat the offer, by abolishing cumulative voting, arranging a speedy defensive merger, quickly incorpo-' rating in a State with an antitakeover statute, or negotiating costly lifetime employment contracts for incumbent management. And the longer the waiting period, the more the target’s stock may be bid up in the market, making the offer more costly- — and less successful. Should this happen, it will mean that shareholders of the target firm will be effectively deprived of the choice that cash tender offers give to them. . . . Generally, the courts have construed the Williams Act so as to maintain these two options for the target company’s shareholders, and the House conferees contemplate that the courts will continue to do so. 122 Cong.Rec. 10293 (1976) (emphasis added). There is no real dispute that the Idaho statute — like most of the state takeover laws — increases a target company’s ability to defeat a tender offer.[46] The Idaho law helps target companies primarily through provisions not found in the Williams Act that give them advance notice of a tender offer[47] and the ability to delay the commencement of an offer, by means such as insisting on a hearing.[48] Most observers of takeover battles agree that time is among the most effective weapons available to a company resisting a tender offer.[49] The Idaho statute favors the target in other ways, as well. Idaho’s regulation of defensive efforts by a target is significantly weaker than Idaho’s regulation of an offer- or’s activities. Compare Idaho Code §§ 30-1504 and 30-1505, with Idaho Code 30-1503-06. Finally, the Idaho statute gives the target corporation board the power to exclude an offer from state regulation by approving the offer. Idaho Code 30-1501(5X3).[50]
The district court concluded that these pro-management provisions evidenced a legislative purpose “to inhibit tender offers for the benefit of management”. 439 F.Supp. at 437. Accord, Moylan, State Regulation of Tender Offers, 58 Marq.L.Rev. 687, 690 (1975). The district court further reasoned that this purpose conflicted with the Williams Act’s purpose of protecting *1279 investors, and that this conflict meant the Williams Act preempted Idaho’s statute. 439 F.Supp. at 437.
McEldowney strenuously objects to the district court’s characterization of the purpose of the Idaho takeover law. He contends that Idaho, like Congress, legislated to protect investors. He explains the pro-management provisions not as an attempt to prevent tender offers, but as a.means of involving the directors and officers of the target in the evaluation of a tender offer. With the advance warning and additional time provided by the state law, so he argues, target directors have an opportunity to fulfill their fiduciary duties to shareholders by studying the offer and either negotiating better terms or making a recommendation based on the shareholders’ interests. Appellant’s Brief at 39-42. McEldowney also explains that management has the power to exclude an offer from Idaho regulation because presumably management will do so only when it already has had opportunity to study the offer thoroughly and to negotiate fully a takeover. Appellant’s Brief at 41. /;
We need not probe the minds of Idaho legislators to determine whether the (true purpose of the Idaho takeover law was. to protect investors or to protect incumbent management. Even if we accept the appelr lant’s interpretation of the legislature’s pur-\ pose, it is still true that Idaho chose to • protect investors differently fram-the way Congress protected investors./instead of /relying upon investors’ decisions after full disclosure, Idaho relies upon the business judgment of corporate directors with a fiduciary duty to their shareholders.) Idaho’s “fiduciary approach” to investor protection may be one way to protect shareholders, but it is an approach Congress rejected.[51]
Idaho’s statute is preempted, because the market approach to investor protection adopted by Congress and the fiduciary approach adopted by Idaho are incompatible. The Senator for whom the Williams Act is named has written, “[ajdvance notice provisions, and requirements concerning the duration of offers, the pro rata purchases of shares, and the withdrawal rights of shareholders either explicitly conflict with federal provisions on the same subjects or are obstacles to the accomplishment of objectives implicit in the federal statutes”. H. Williams, Introduction to Developments in Tender Offers for Corporate Control xix (1977)./Congress intended for the investor to evaluate a tender offer; Idaho asks the target company manage-rfiient to make that decision on behalf of the /shareholders./ See generally Note, Corn-merce Qausl Limitations upon State Regulation of Tender Offers, 47 S.Cal.L.Rev. 1133, 1150 (1974). That Congress rejected provisions very similar to some of those in the Idaho takeover statute does not mean the state law is automatically preempted. See, e. g., DeCanas v. Bica, 1976, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43. In this situation, however/Congress rejected those , provisions to preserve the neutral regula\tory stance that gives each side of a tender offer an equal opportunity to persuade the investor. When Idaho enacted those reject-zed provisions it hampered an offeror’s ability to express and explain its position directly to investors. In doing so, Idaho disrupted the neutrality indispensable for the prop *1280 er operation of the federal market approach to tender offers regulation.[52] /he Idaho takeover statute “stands as an Obstacle to the accomplishment and execution of the full purposes and objectives” of the Williams Act.[53]
The Idaho statute requires substantially more disclosure than the Williams Act. Compare Idaho Code § 30-1503(2) with Schedule 14D-1, 17 CFR 240 HD-100. In that respect, as the SEC points out, it also interferes with federal regulation. See SEC amicus brief at 41-42. McEldowney argues that Congress had the express desire to get information to investors. Idaho’s more demanding disclosure requirements, he contends, only go further in the same direction, thereby carrying out rather than' frustrating the purposes and objectives of Congress.
Superficially Idaho’s extensive disclosure requirements appear compatible with a market approach to tender offer investor protection. In reality, in the area of financial disclosure it can be true that “less is more”. Disclosure of a mass of irrelevant data can confuse the investor and obscure relevant disclosures. Hearings on S.510 Before Subcommittee on Banking and Commerce, 90th Cong., 1st Sess. at 205 (1967) (Senate Hearings) (statement of Mr. Cohen); Corporate Takeovers, Hearings Before the Senate Committee on Banking, Housing and Urban Affairs, 94th Cong., 2d Sess. 90 (1976) (Corporate Takeovers) (statement of Mr. Loomis); Aranow, Ein-horn & Berlstein, Developments in Tender Offers for Corporate Control 219-20 (1977). Management may also be able to halt an offer because some immaterial information required by excessive disclosure standards is missing or inaccurate. See Idaho Code § 30-1503; Aranow, Einhorn & Berlstein at 220. Those excessive requirements would cut off an offeror’s opportunity to present the material information that investors need to make their decisions.
In § 13(d) of the Williams Act Congress delegated to the SEC the task of specifying what data is material to an investor considering a tender offer. The SEC has attempted to write disclosure requirements that provide enough material information without producing reports so detailed and *1281 complicated that few shareholders would want to read them. See Corporate Takeovers at 90 (statement of Mr. Loomis). That judgment is a legislative one. See Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. at 175, 83 S.Ct. 1210 (White, J., dissenting). Idaho’s effort to second guess that judgment cannot stand. Id. This is particularly true because Idaho’s additions to the federal disclosure requirements reduce the utility of federally required disclosure and produce an obstacle to the accomplishment of the federal objective to enable investors to make an informed choice about a tender offer.
V.
THE VALIDITY OF THE IDAHO TAKEOVER STATUTE UNDER THE COMMERCE CLAUSE
The commerce clause, U.S. Const., art. I, § 8, grants to Congress the power to regulate foreign and interstate commerce. This affirmative grant also imposes limits upon state power to regulate commerce over which Congress has primary responsibility. See, e. g., The Great Atlantic and Pacific Tea Co. v. Cottrell, 1976, 424 U.S. 366, 370-71, 96 S.Ct. 923, 47 L.Ed.2d 55. Nevertheless, not every exercise of state power with some impact on interstate commerce is invalid. “Rather, in areas where activities of legitimate local concern overlap with the national interests expressed by the Commerce Clause — where local and national powers are concurrent— the Court in absence of congressional guidance is called upon to make ‘delicate adjustment of the conflicting state and federal claims’ ”. Id., quoting H. P. Hood & Sons, Inc. v. DuMond, 1949, 336 U.S. 525, 553, 69 S.Ct. 657, 93 L.Ed. 865 (Black, J., dissenting).

A. Congressional Permission

McEldowney contends that no adjustment of state and federal claims is necessary here because Congress consented in the 1934 Act to state takeover laws that might otherwise contravene the commerce clause. Congress has the power to give such consent and thereby to waive usual commerce clause restrictions. E. g., Southern Pacific Co. v. Arizona, 1944, 325 U.S. 761, 769, 65 S.Ct. 1515, 89 L.Ed. 1915. See generally P. Brest, Processes of Constitutional Decisionmaking 219-22 (1975); G. Gunther, Cases and Materials on Constitutional Law 367-71 (9th ed. 1975). To determine whether Congress has consented to state regulation of tender offers that interferes with interstate commerce we must examine again § 28 of the 1934 Act, 15 U.S.C. § 78bb (1970). This is the provision that the appellant reads to give such consent.
That examination convinces us that § 28 does not consent to otherwise invalid state laws. When Congress has exempted state laws from commerce clause restrictions it has used language specifically directing that certain interstate commerce may be regulated as though it were purely local. See, e. g., the Wilson Act of 1890, 26 Stat. 313. Congress has also stated that, in the absence of affirmative Congressional action, courts should impose no barriers on state regulation. See the McCarran-Ferguson Act, 59 Stat. 33,15 U.S.C. § 1011 et seq. The language in § 28 of the 1934' Act is notably different from these acknowledged examples of Congressional consent. Rather than allowing violations of the commerce clause, § 28 appears to direct only that federal securities law should not be interpreted as a wholesale displacement of state securities regulation.
The legislative history of § 28 demonstrates that even if we were to interpret § 28 to remove some commerce clause restrictions, that consent would not be broad enough to settle the commerce clause issue raised by the Idaho takeover law. The jurisdiction preserved in § 28 is that “of state security commissions to regulate transactions within their own borders.” H.R.Rep.No.85, 73d Cong., 1st Sess. 10 (1933) (emphasis added). See also Langevoort, State Tender Offer Legislation: Interests, Effects, and Political Competency, 62 Cornell L.Q. 213, 247 (1977). The Idaho takeover law, in contrast, controls transactions made throughout the world.

*1282
B. The Pike Test

Because Congress has not settled the commerce clause issues raised in this case, we must look to the numerous Supreme Court decisions on the commerce clause for guidance. Fortunately, the Court has recently undertaken a restatement and distillation of its cases. See Dixie Dairy Co. v. City of Chicago, 7 Cir. 1976, 538 F.2d 1303, 1308. In Pike v. Bruce Church, Inc., 1970, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174, a unanimous Court adopted the following statement of the law:
Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. Huron Cement Co. v. Detroit, 362 U.S. 440, 443, 4 L.Ed.2d 852, 856, 80 S.Ct. 813, 816 [78 A.L.R.2d 1294], If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local intent involved, and on whether it could be promoted as well with a lesser impact on interstate activities.
Accord, Raymond Motor Transportation, Inc. v. Rice, 1978, 434 U.S. 429, 441, 98 S.Ct. 787, 794, 54 L.Ed.2d 664; A & P Tea Co. v. Cottrell, 424 U.S. at 371-72, 96 S.Ct. 923.[54]

1. Legitimate local purposes.

The district judge concluded that the immediate purpose of the Idaho takeover law is to protect incumbent management. The district judge further ruled that this purpose is not a legitimate one for state regulation and that no other legitimate local purpose for the Idaho law could be found. McEldowney strongly condemns these findings as a usurpation of the Idaho legislature’s functions. We agree with him that at this stage of its analysis the district court too quickly dismissed possible legitimate local interests served by the Idaho takeover law.
It is true that the Idaho law helps incumbent management. One purpose of this favoritism may be to prevent the removal of local business to other states. This purpose would be unacceptable. Indeed, statutes requiring business operations to be performed in the home state that could more efficiently be performed elsewhere impose a burden on commerce that is per se illegal. Pike v. Bruce Church, Inc., 397 U.S. at 145, 90 S.Ct. 844, 25 L.Ed.2d 174. Idaho’s law does not require any business to remain in Idaho; at worst, it hinders relocation. Nevertheless, the purpose of preserving local industry cannot support the legislation. Nor can that effect be ignored.
McEldowney advances a different state interest in helping incumbent management. He points out that a corporation can influence local lifestyle through such means as *1283 charitable contributions or civil involvement and the depth of its commitment to issues such as pollution control or job safety. He contends that this interest in benevolent management is a legitimate reason for Idaho to regulate the means by which outsiders can change management. We accept this as a legitimate local interest.
MeEldowney argues that the true purpose of the Idaho takeover statute is to protect investors. This is certainly a legitimate purpose. Since we are not concerned at this step of our analysis with the relationship between the legitimate purpose and the means of regulation, we also consider this interest. We note, however, that Idaho has little reason to protect shareholders of other states, if their securities transactions do not take place within that state or substantially affect Idaho shareholders. See Wilner & Landy, The Tender Trap: State Takeover Statutes and Their Constitutionality, 45 Ford.L.Rev. 1, 17 (1976); Note, Commerce Clause Limitations upon State Regulation of Tender Offers, 47 S.Cal.L.Rev. 1133, 1153 (1974). See also Hall v. Geiger-Jones Co., 1917, 242 U.S. 539, 557-58, 37 S.Ct. 217, 61 L.Ed. 480, where the Court turned back a commerce clause challenge to Blue Sky laws in part because the laws regulate only transactions within the state. Cf. Federal Securities Code § 1904(c) (Proposed Official Draft 1978) which would preempt state regulation of tender offers unless the target has its principal place of business in the regulatory state and more than 50 percent of the record or beneficial holders of the target’s outstanding voting securities holding more than 50 percent of those securities are residents of the regulatory state. In this case, only about two percent of Sunshine’s shareholders reside in Idaho. That there are even that many is by chance. Idaho’s law would have applied even if no shareholders had resided in Idaho and no securities transactions had taken place within Idaho. Moreover, the business realities of tender offers make it unlikely that there will be many offers for corporations held predominately by Idahoans (or citizens of any other narrow geographic area). Investment bankers know that local owners are characteristically loyal to management. Therefore, corporations with widespread stock ownership are more promising tender offer targets. See, e. g., Trough, Characteristics of Target Companies, 32 Bus.L. 1301, 1301-02 (1977).

2. Impact on interstate commerce.

Rather than establishing interference with commerce that occurred in connection with the Great Western offer for Sunshine, much of the evidence in this case consisted of disputed expert opinions about the general impact Idaho’s law would be likely to have on the making of interstate offers and the functioning of national securities markets. One of the effects mentioned at trial is the disruption of the normal securities markets that state-mandated advance notification or announcement of an offer can cause.[55] Another is a change in strategy by offerors. For instance, an offeror antici-patihg a battle during the delay caused by a state law might deliberately make a low initial offer so that it can raise its offer to meet that of a competitor. There was also testimony that state statutes such as Idaho’s have a general effect of discouraging tender offers. These effects — and others— have been identified by several commentators. See, e. g., Aranow, Einhorn & Berl-stein, Developments in Tender Offers for Corporate Control 229-30 (1977); Moylan, State Regulation of Tender Offers, 58 Marq.L.Rev. 687, 691-92; Subcommittee on Proxy Solicitations and Tender Offers, Federal Regulation of Securities Committee, American Bar Association, State Takeover Statutes and the Williams Act reprinted at 32 Bus.L. 187, 193 (1976); Wilner & Landy, The Tender Trap: State Takeover Statutes and Their Constitutionality, 45 Ford.L.Rev. *1284 1, 10-11, 14, 20 (1976); Note, 47 S.Cal.L. Rev. at 1149-52; [1969] Sec.Reg. & L.Rep. (BNA), No. 1 at All.
To some extent this evidentiary situation was unavoidable. State takeover laws can have numerous effects on a tender offeror’s plans. It would be unusual for each of those effects to be felt in a single offer. Nevertheless, we would hesitate to agree with the district court that the evidence shows a substantial effect on interstate commerce if the record contained only speculation about the effect of Idaho’s statute and of state takeover laws in general. The record contains more. Baptie’s letter of March 21,1977 delayed an interstate tender offer that would otherwise have gone forward.[56] That action in itself not only had a substantial impact on interstate commerce, it stopped over 31 million dollars of interstate commerce. An executive of Great Western testified that after Baptie’s letter the company doubted it could ever satisfy Idaho’s requirements. Tr. at 156.
In addition, except in the rare tender offer made entirely within Idaho, Idaho’s extraterritorial approach to tender offer regulation has an inherent impact on interstate commerce. Idaho’s law is designed to alter the disclosure made in securities transactions between Idaho and another state, two other states, and even entirely within another state. Idaho’s law can also change the time when, if ever, those non-Idaho securities sales will occur. Cf. Southern Pacific Co. v. Arizona, 325 U.S. at 773-75, 65 S.Ct. 1515 (state restriction of train lengths that, in practical effect, regulated the length of out-of-state trains).
Finally, Great Western introduced evidence that if New York had also asserted jurisdiction over the Sunshine offer its legal requirements would have contradicted Idaho’s. According to George Boswell, Executive Vice-President of Great Western, Great Western was concerned that the advance publication of a tender offer required by Idaho law would violate New York’s prohibition of publication. Tr. at 154. Another witness, Jeffrey B. Bartell, testified that it was “conceivable” that the advance publication required by Idaho could constitute an unregistered offering in another state. Tr. at 70. Mr. Bartell gave no specific examples.
This evidence is important because in cases where the rules of different states conflict, the Supreme Court has been severe in its scrutiny of state legislation. L. Tribe, American Constitutional Law 339 (1978). Although the potential for such conflict was once enough to trigger such scrutiny, recently the Court has required a showing of actual conflict. Id.; G. Gunther at 317-18. The evidence in this case falls somewhere in between. There is evidence that states have already passed contradictory laws, but the evidence is not overwhelming. The sole example of an actual conflict rests on the plaintiff’s own conclusion that a conflict exists between New York and Idaho law. That conclusion, to our knowledge, has never been litigated and may be incorrect.[57] Moreover, since New York ultimately did not assert jurisdiction Great Western was never subjected to conflicting legal requirements. Nor was there evidence of any other offer actually subjected to conflicting state requirements. On the other hand, several commentators have examined the state takeover statutes and expressed a concern that they may be contradictory. See, e. g., Aranow, Einhorn & Berlstein, Developments in Tender Offers for Corporation Control 228 (1977); ABA Subcommittee on Proxy Solicitations and Tender *1285 Offers, Federal Regulation of Securities Committee, State Takeover Statutes and the Williams Act reprinted at 32 Bus.L. 186, 189,193 (1976); Corporate Takeovers, Hearing before the Senate Committee on Banking, Housing and Urban Affairs, 94th Cong., 2d Sess. 90 (1976) (statement of SEC Chairman Loomis).
The record before us may not warrant the harsh commerce clause scrutiny that follows a demonstration of actual conflict between state rules. The demonstrated concern that state laws may conflict, however, supports other testimony that state statutes such as Idaho’s deter tender offers. At any rate, we conclude that evidence other than that concerning conflicting state rules supports the view that the Idaho statute has a substantial impact on interstate commerce for purposes of the Pike analysis.
3. The balance of the burden and the benefit.
The final step under Pike is to determine whether the legitimate local purposes served by Idaho’s takeover statute justify the law’s substantial impact on interstate commerce. As with any balancing analysis, we must first determine what degree of judicial examination is appropriate. At one time the Supreme Court assumed a deferential stance in commerce clause cases. See, e. g., South Carolina State Highway Department v. Barnwell Bros., 1938, 303 U.S. 177, 190-91, 58 S.Ct. 510, 82 L.Ed. 734. Since 1938, however, a more intensive inquiry into the reasonableness of state regulation has evolved. See, e. g., Raymond Motor Transportation, Inc. v. Rice, 434 U.S. at 440-444, 98 S.Ct. at 794-795; Bibb v. Navajo Freight Lines, Inc., 1959, 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003; Southern Pacific Co. v. Arizona, 1945, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915; G. Gunther at 308-11, 315. The Court has scrutinized the fit between the state’s purpose and its regulation. It has also asked whether alternative means of achieving the purpose would impose fewer burdens on interstate commerce, in a manner similar to “least restrictive alternative” analysis. See, e. g., Pike v. Bruce Church, Inc., 397 U.S. at 142, 90 S.Ct. 844.
These more recent cases require greater justification for a law challenged on commerce clause grounds than for one challenged as a violation of due process.[58] G. Gunther at 311. Thus, while we are far from eager to invalidate Idaho’s takeover law, we are free to use a stricter standard than the “rational relationship” test of due process analysis. We are interested in the substantiality of both the local interest itself and the link between the interest and the Idaho takeover law. Finally, we note that the challenged regulations are not examples of the kind of safety regulations the Court has been particularly reluctant to strike down. See, e. g., Pike v. Bruce Church, Inc., 397 U.S. at 143, 90 S.Ct. 844, quoting Southern Pacific Co. v. Arizona, 325 U.S. at 796, 65 S.Ct. 1515 (Douglas, J., dissenting).
One state interest to consider is that of protecting investors. The strength of this interest is substantially diluted because Idaho has little reason to protect the large majority of the shareholders affected by the takeover act. In addition, as the district court pointed out, the benefits to investors from the Idaho takeover statute are not certain. 439 F.Supp. at 439. McEldow-ney asserts that during the state imposed delay of a tender offer, the original offeror may be forced to raise the offer, or another more advantageous competing offer may be made. Nothing in the Idaho statute guarantees those benefits. Indeed, shareholders could be harmed by the delay if during the waiting period the offeror reduces the offer or abandons altogether a bid shareholders would want to accept if they had a chance. See generally, Langevoort, 62 Cornell L.Q. at 228.
The additional disclosure required by Idaho’s statute may assist some shareholders. It may confuse others. Moreover, addition *1286 al disclosure from the offeror is not likely to be of great use to a shareholder making economic judgments about the desirability of a tender offer. The key relationship is that between the price offered and the value of the target under current management. See Brudney, A Note on Chilling Tender Solicitations, 21 Rutgers L.Rev. 609, 616-20 (1967). Incumbent management is •more likely to possess information about the current value of the target than is the offeror. Langevoort, 62 Cornell L.Q. at 230.
Another interest asserted by the appellant is that of encouraging civic responsibility by the management of local corporations. No doubt this can be a substantial interest. We question, however, whether it is advanced more than incidentally by the statute challenged in this lawsuit. Surely it cannot be true that all incumbent managers are model corporate citizens or that all tender offerors are vandals. The record certainly contains no support for such a conclusion. Yet, the Idaho takeover statute imposes the same handicaps on all offerors and the same advantages on all incumbent managers.
There is, of course, some relation between the Idaho takeover law and the interest in responsible management. The increased disclosure required by state law might help interested shareholders to determine whether a tender offeror is civically responsible. But that information would be of no help if it is never disclosed because the burdensome state requirements discourage a responsible offeror from ever making an offer for an Idaho corporation. Nor would the state law help if civically irresponsible incumbents are able to force an offeror to abandon his bid by invoking time consuming hearing processes or litigating the adequacy of the immaterial disclosures required by the Idaho statute. Moreover, disclosure will not be an effective means of encouraging corporate civic responsibility if the shareholders concentrate more on the economics of an offer than the civic attitudes of the offeror. This economic bias seems particularly likely when, as here, most of the shareholders are not Idahoans. See generally, Senate Hearings at 157 (statement of Mr. Schanch).
Idaho could encourage good corporate citizenship with legislation more focused on that purpose. Health and safety regulations can be enacted. Tax incentives can encourage charitable contributions. Programs to involve local businessmen in civic problems can be created. These approaches would be likely to have a more direct impact on corporate behavior than increased disclosure in tender offers. They would also impose a substantially smaller burden on interstate commerce than the Idaho takeover law.
Against this uncertain protection for the small percentage of Sunshine shareholders in whom Idaho has a substantial legitimate local interest, and the, at best, indirect and incidental preservation of corporate civic responsibility provided by fuller disclosure, we must weigh our conclusions about the impact of Idaho’s takeover statute on interstate commerce. Idaho’s extraterritorial regulation of tender offers interferes with securities transactions all over the country. In this case, Idaho’s law halted over 31 million dollars of interstate commerce. In addition, Idaho’s statute would have compelled a non-Idaho offeror to make burdensome disclosures beyond those required by federal law to Sunshine shareholders all over the world.[59]
We conclude that these burdens are disproportionate to the legitimate benefits the Idaho takeover law provides. This conclusion is strengthened because another effect — perhaps unintended — of the Idaho statute is to hinder the movement of local businesses to other states. As a result, we agree with the district court that the Idaho takeover law is invalid under the commerce clause.
*1287 VI.
THE FOURTEENTH AMENDMENT
Great Western’s final attack on the Idaho takeover law is that it violates due process because it delegates the legislative power to invoke the state regulatory provisions to private parties — the target’s board of directors — without setting sufficient standards for the exercise of that authority. Although this theory is included in Great Western’s original complaint, it was not addressed in the district court’s opinion and was not pressed during trial.
The anti-delegation doctrine reached its height in Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570. Since Schechter delegations to private parties may have been viewed with some suspicion but Schechter has spawned few progeny. See K. Davis, Administrative Law Treatise § 2.17 (1970 & 1976 Supp.); L. Tribe, American Constitutional Law § 5.17 (1978). The delegation of authority in Idaho’s takeover law does not contravene what remains of the principle. The fiduciary duties owed by corporate directors to their shareholders provide sufficient standards for the exercise of delegated power. The fiduciary duties imposed on Sunshine’s directors came from Washington, rather than Idaho. Basie fiduciary duties are similar, however, in all the states and the Idaho legislature could legitimately rely upon those duties to guide target corporation directors.
VII.
CONCLUSION
The states have an important role in our system of securities regulation. We do not invalidate Idaho’s attempt to supplement the Williams Act without careful consideration of all the arguments raised by the appellant and the amici. Nor are we unmindful that state experiments with regulation can be as useful in the subject of securities as in other areas. See New State Ice Co. v. Liebman, 1932, 285 U.S. 262, 280, 52 S.Ct. 371, 76 L.Ed. 747 (Brandeis, J., dissenting). But, as Justice Brandeis pointed out, such experimentation should be “without risk to the rest of the country.” Id. at 311, 52 S.Ct. at 387. The Idaho legislature, through its extraterritorial law, made the entire country its laboratory. The takeover statute had extensive, deliberate, and foreseeable effects on transactions having only a minimal connection with Idaho.
The judgment is AFFIRMED.

. Wayne L. Kidwell, the Attorney General of Idaho, was also a defendant before the district court. He has chosen not to appeal to this Court.

. The thirty-one other statutes are Alaska Stat. §§ 45.57.010-.120 (Cum.Supp.1976) (eff. June 8, 1976); Ark.H.B. No. 546 (eff. Mar. 24, 1977); Colo.Rev.Stat. §§ 11-51.5-101 to 108 (Cum.Supp.1976) (eff. July 1, 1975); Conn.Gen.Stat. Ann. §§ 36-347a to 347m (West Supp.1976) (eff. June 1, 1976); Del.Code Ann. tit. 8, § 203 (Cum.Supp. 1976) (eff. May 1, 1976); Fla.Laws ch. 77-441 (1977) (eff. Oct. 1, 1977); Ga.H. B.No. 320 (eff. Mar. 1, 1977); Haw.Rev.Stat. §§ 417E-1 to -15 (Supp.1975) (eff. May 24, 1975) ; Ind.Code Ann. §§ 23-2-3-1 to 12 (Bums Supp.1976) (eff. May 1, 1975); Kan.Stat.Ann. §§ 17-1276 to 1285 (1974) (eff. July 1, 1974); Ky.Rev.Stat.Ann. §§ 292.560-.630 (Baldwin Cum. Issue 1976) (eff. July 1, 1976); La.Rev. Stat.Ann. §§ 51:1500-:1512 (Cum.Supp.1977) (eff. June 28, 1976); Md.Corp. & Ass’ns Code Ann. §§ 11-901 to 908 (Cum.Supp.1976) (eff. July 1, 1976); Mass.Laws Ann. ch. 110C, §§ 1-13 (Lawyer’s Co-Op. Supp.1977) (eff. May 22, 1976); Mich.Stat.Ann. §§ 21.293(1)-(17) [M.C.L.A. §§ 451.901-451.917] (Cum.Supp. 1977) (eff. July 1, 1976); Minn.Stat.Ann. §§ 80B.01 to .13 (West Cum.Supp. 1977) (eff. Aug. 1, 1973); Miss.Code Ann. §§ 75-72-1 to 72-23 (Cum.Supp.1977) (eff. July 1, 1977); Neb.L.B. No. 303 (1977); Nev.Rev.Stat. §§ 78.-3776-3778 (1973) (eff. Mar. 4, 1969); N.H.Rev. Stat. 421-A-l to A-15 (1977); N.J.S.B. No. 808 (1977) (eff. April 27, 1977); N.Y.Bus.Corp.Law §§ 1601-1613 (McKinney Supp.1976) (eff. Nov. 1, 1976); N.C.L. ch. 781 (1977) (eff. June 28, 1977); Ohio Rev.Code Ann. § 1707.041 (Page Supp.1976) (eff. Oct. 9, 1969); Pa.Stat.Ann. tit. 70, §§ 71-85 (Purdon Supp.1977) (eff. Mar. 3, 1976) ; S.D.Compiled Laws Ann. §§ 47-32-1 to 47 (Supp.1977) (eff. July 1, 1975); Tenn.Code Ann. §§ 48-2101 to 2114 (Cum.Supp.1976) (eff. Mar. 17, 1976); Tex.Reg. §§ 065.15.00.100-1700 (1977); Utah Code Ann. §§ 61-4-1 to 13 (Supp. 1977) (eff. Feb. 5, 1976); Va.Code Ann. §§ 13.1-528 to 541 (Cum.Supp.1977) (eff. Mar. 5, 1968); Wis.Stat.Ann. §§ 552.01-.25 (West Spec.Pamph. 1977) (eff. July 1, 1972).
An orthodox tender offer is a publicly made invitation, usually announced in a newspaper advertisement, to all shareholders of a corporation, to tender their shares for sale at a specified price. To induce the shareholders to sell, the price usually includes a premium over the current market price of the target company’s shares. Cash or other securities may be offered to the shareholders as consideration. An offer is made for a limited period of time only. An offeror may offer to buy all tendered shares, or it may offer to buy only a stated number. In general, the offeror also sets a minimum number of shares that must be tendered before he will buy any shares. The Williams Act regulates transactions other than orthodox tender offers. See, e. g., Aranow, Einhorn & Berlstein, Developments in Tender Offers for Corporate Control 1-34 (1977). Indeed, neither Congress nor the SEC has attempted to define the term “tender offer”. Id. at 1.
A tender offer may be used either to acquire control of a company or for nontakeover purposes. Recently, most tender offers have been for the purpose of gaining control over the target. For a more detailed description of tender offers, see Note, The Developing Meaning of “Tender Offer” Under the Securities Exchange Act of 1934, 86 Harv.L.Rev. 1250, 1251-54 (1973); Note, Cash Tender Offers, 83 Harv. L.Rev. 377, 377-81 (1969), and the sources cited in the note.

. Pub.L. No. 90-439, 82 Stat. 454, July 29, 1968 (embodied in §§ 13(d), 13(e), 14(d), 14(e) and 14(f); 15 U.S.C. §§ 78m(d), 78m(e), 78n(d), 78n(e), 78n(f)).

. In most tender offers speed is of utmost importance. Rather than accept the delay that a court challenge to state law would require, most offerors either settle their differences with incumbent management or abandon their offers. Indeed, some observers feared that the courts would never have an opportunity to rule definitively on the important questions raised in this appeal. See, e. g., Sommer, Commentary, State Takeover Statutes and New Takeover Strategies, 32 Bus.L. 1483, 1485 (1977).

. Ohio filed a brief and participated in oral argument. Utah and New York filed briefs. Louisiana joined in Ohio’s brief, and Wisconsin joined in a portion of New York’s brief.

. On March 18, 1977, three days before it announced its tender offer, Great Western revealed that it had agreed to purchase, from the Hecla Mining Company and the Silver Dollar Mining Company, 334,070 shares of Sunshine, representing about six percent of Sunshine. In December 1976 Hecla and Silver Dollar had underwritten an unsuccessful proxy fight to oust Sunshine’s management. Great Western agreed that if it successfully gained control of Sunshine, it would reimburse Hecla and Silver Dollar up to $200,000 for their proxy fight expenses.

. 15 U.S.C. §§ 781 (i), 78m(d)-(e), 78n(d)-(f) (1970).

. Although the Williams Act has been amended, Congress has not changed the basic approach to the regulation of tender offers adopted in the original statute.

. The provisions of the Williams Act are summarized in Note, The Developing Meaning of “Tender Offer” Under the Securities Exchange Act of 1934, 86 Harv.L.Rev. 1250, 1254-60 (1973).

. Schedule 13D was the disclosure form for tender offerors at the time Great Western made its offer for Sunshine. The current disclosure form for tender offerors is Schedule 14D.

. Sunshine filed suit against Great Western in the District of Idaho alleging violations of the Williams Act. Such a filing, however, does not automatically stop a tender offer. On April 22, 1977 the district court denied a preliminary injunction in Sunshine’s Williams Act suit. The court held that Sunshine had shown neither irreparable harm nor a probability of success on the merits with regard to its claims of non-disclosure. Sunshine Mining Co. v. Great Western United Corp., D.Id., 1977, [1977-78] CCH Fed.Sec.L.Rep. fl 96, 049.

. Idaho Code § 30-1501(6) defines a “target company” as, among other corporations, a company with its principal office in Idaho or with substantial assets located in Idaho. Sunshine clearly fell within both these definitional requirements.

. Idaho Code §§ 30-1503(l)-(2).

. Idaho Code § 30-1503(1).

. Idaho Code § 30-1503(1); Definitions of the Rules and Regulations for Chapter 15 of the Idaho Statutes, The Idaho Corporate Take-Over Law t 6.

. Idaho Code § 30-1508. The fees range from $500 to $5,500.

. Idaho Code § 30-1503(4).

. Idaho Code § 30-1506(5).

. See Idaho Code §§ 30-1503, 30-1506(6).

. Idaho Code § 30-1503(3).

. Idaho Code § 30-150I(5)(e).

. Idaho Code § 30-1510.

. Sunshine’s Williams Act suit against Great Western was settled and dismissed by the district court on October 5, 1977, after the entry of the district court’s order in the case now on appeal. The settlement provided that Great Western would offer $15 per share for up to 1,275,000 shares. Great Western also agreed to exchange securities or notes worth $15 per share for the balance of the 2,000,000 shares it had originally sought.

. Our conclusion that under Young the state has no interest in this lawsuit leads us to reject New York’s argument that service of process must be made pursuant to Fed.R.Civ.P. 4(d)(6).

. State law in this case goes to the limits of due process under the federal constitution. Accordingly, we need not discuss whether state or federal law governs amenability to suit when a state long arm statute is used to secure per- . sonal jurisdiction in a federal question case. See 4 C. Wright & A. Miller, Federal Practice & Procedure § 1075 (1969).

. The Supreme Court’s Kulko opinion expresses some concern that allowing jurisdiction in Kulko might undermine the principle that a plaintiff cannot unilaterally create the contacts that support personal jurisdiction. The Court points out that the plaintiff-mother moved to California, and that the defendant-father did no more than acquiesce in his children’s move to the West Coast. That personal jurisdiction in this case is clearly based on actions by the defendants further distinguishes Kulko.

. By following Product Promotion’s interpretation of Hanson v. Denckla we do not hold, as the dissent suggests we do, that Hanson v. Denckla’s requirement that a defendant purposefully avail himself of the benefit of state law has been eliminated. None of the cases cited in the dissent conflict with Product Pro *1269 motion’s holding that the Hanson v. Denckla language should be read as a restatement of the due process rule that the defendant must create sufficient contacts with the forum before a state may assert personal jurisdiction over him.

. This discussion is to satisfy those who insist that the Hanson v. Denckla language about a defendant’s availing himself of the benefit of the forum’s laws establishes an independent test. It is possible to envision a role for Texas in the enforcement of Idaho’s statute. As the dissent points out, this role becomes an active one only if Idaho tries to enforce its law in certain circumstances, such as against Texas defendants who refuse to leave Texas and return to Idaho. The dissent’s major objection to this discussion is that it makes the Hanson v. Denckla requirement too easy to satisfy, not that it is impossible to envision a role for Texas in the enforcement of Idaho’s law. The dissent fears that governors, state prosecutors, and other state regulatory officials will be subject to countless out-of-state civil suits simply because they might at one time rely upon another state’s extradition procedures for the full faith and credit clause of the Constitution. Governors, state prosecutors and other state regulatory officials need fear no such outcome from the majority opinion. That a defendant in some manner benefits from a state’s laws does not automatically mean that International Shoe’s due process requirements are satisfied. That benefit is only one factor for a court to consider, and it is a factor to discount if the benefit is attenuated or speculative. Jurisdiction over the Idaho officials in Great Western’s suit is supported by much more than Idaho’s possible need for Texan help with the enforcement of the penalties in its takeover law.

. Because we have found the International Shoe requirements to be satisfied, we, like the court in Black v. Acme Markets, Inc. may defer the question whether those requirements apply *1271 to federal courts sitting in federal question cases brought under statutes providing for worldwide service of process. See Judge Goldberg’s discussion in Black, 564 F.2d at 686 n. 8.

. Any person who willfully violates any provision of this chapter, or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter . shall upon conviction be fined not more than $10,000, or imprisoned not more than two years or both . . . but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

. Our impression, however, is that the SEC is correct. The first sentence of § 27 provides “The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder.” (Emphasis added). This sentence supports the SEC’s argument, for it draws a clear distinction between violations and suits to enforce a duty created by the 1934 Act. One difficulty with the SEC’s construction of the statute is that the sentence of § 27 establishing jurisdiction and venue over suits to enforce a duty created by the 1934 Act refers back to the preceding sentence that is cast in terms of “violations”.

. A short swing trade occurs when the purchase and sale of the security occur within six months. See generally II L. Loss, Securities Regulation 1040-1132 (1961).

. Even though we conclude that Great Western’s claim arose in Texas, venue would have been proper in Idaho as well because that is the judicial district where all defendants reside. But see text after note 35 discussing venue in a suit against officials from more than one state.

. Cf. the suggested rules that a tort claim arises where the injury occurs, not where the negligent act takes place and that a contract claim arises where the contract is to be performed, not in the district where it was written. 1 J. Moore fl 0.142[5. — 2] at 1434-35 (1977).

. The district court erred, in our opinion, by-analyzing the alleged violation as a restraint upon Sunshine shareholders who would have tendered rather than as interference with Great Western’s plans. That analysis led the district court to conclude that the claim did not arise in Texas because it could be argued equally well that the claim arose in any district where a Sunshine shareholder resided. We might note that an alternative to this conclusion would have been that each restraint of a Sunshine shareholder constituted a separate claim that arose only in the district where that particular shareholder lived.

. Several of the amici contend that we should refrain from deciding this case under the Pullman and Younger abstention doctrines. McEl-downey did not raise this point before the district court; nor does he argue it to us. This is not an appropriate case for abstention under either doctrine.

. To the extent our discussion rests on an anticipation of the merits of the case, we rely on the principle that we have jurisdiction to determine so much of the merits as .is necessary to decide a jurisdictional dispute. See, e. g., United States v. United Mine Workers, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884.

. In Rice, the Court discussed some circumstances that show an implicit Congressional desire to preempt all state regulation in a given field:
The scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the state to supplement it. Or the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Likewise, the object sought to be obtained by the federal law and the character of obligations imposed by it may reveal the same purpose.
Rice v. Santa Fe Elevator Corp., 1947, 331 U.S. 218, 229-30, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447. Accord, Pennsylvania v. Nelson, 1956, 350 U.S. 497, 502-05, 76 S.Ct. 477, 100 L.Ed. 640.

. We disagree with the appellant that § 28 sets forth a different test from the test required by the supremacy clause. Nevertheless, we should point out that Jones v. Rath Packing Co. casts doubt on McEldowney’s assertion that § 28, if interpreted in the narrow way he urges, would eliminate the need to apply the Hines test. In Jones, the Court interpreted a provision of the Fair Packaging and Labeling Act, 15 U.S.C. § 1461 (1970), to explicitly pre-empt state law only when compliance with state law would automatically trigger federal enforcement action. 430' U.S. at 540, 97 S.Ct. 1305. The California statute challenged in the Jones litigation was not preempted under that standard. Id. The Court went on, however, to apply Hines to the California law, and ruled that under Hines the state law was invalid. 430 U.S. at 543, 97 S.Ct. 1305. See also Note, Pre-emption as a Preferential Ground: A New Canon of Construction, 12 Stan.L.Rev. 208, 212-15 (1959) where the author discusses how the courts have paid slight attention to general savings clauses in pre-emption cases.
In addition, § 28 arguably does not apply to state takeover statutes. Section 28 was part of the original 1934 Act. It was designed to preserve state Blue Sky laws, which were well established before 1934. In contrast, when Congress enacted the Williams Act only Virginia had a takeover law, and it was enacted just before Congress passed the bill. There is no mention of state legislation in the Senate or House hearings. When subsequent state legislation is not of substantially the same character as the laws Congress intended to save, the savings clause may not save the subsequent state laws. See Langevoort, State Tender-Offer Legislation: Interests, Effects, and Political Competence, 62 Cornell L.Q. 213, 247 (1977) and sources cited therein.

. For instance, the SEC points out that pre-commencement publication under Idaho Code § 30-1503(1) could arguably be deemed publi *1276 cation to security holders within the meaning of § 14(d)(1) of the Williams Act. SEC amicus brief at 40 n. 137. If so, the ten day period of § 14(d)(6), the provision requiring an officer to purchase on a pro rata basis the shares tendered during the first ten days of an offer if too many shares are tendered, would begin. Idaho has a similar provision, Idaho Code 30-1506(3), but its ten day period begins only after the offer is effective under Idaho law. As a result, the Williams Act rights of a shareholder tendering during the first ten days of the federal counting period might be diluted. See Ara-now, Einhorn & Berlstein, Developments in Tender Offers for Corporate Control 227 (1977). A similar argument can be made about withdrawal privileges. Section 14(d)(5) and Idaho Code 30-1506(2) both make tenders irrevocable between the eighth and sixtieth day of an offer. If the offer is deemed to commence on a different day, however, the two time periods conflict. See id.
In addition, Great Western contends that Idaho Code 30-1503 requires offerors to disclose projections that would not be allowed under federal standards because the projections are too uncertain. Tr. at 163.

. SEC v. National Securities, Inc., 1968, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 involved not the 1934 Act, but the very different McCar-ran-Ferguson Act, 15 U.S.C. §§ 1011-15, dealing with the regulation of the business of insurance by state or federal law. The language of the case is also not as helpful as the appellant’s brief suggests.
Several other cases, including Travelers Health Ass’n v. Virginia, 1950, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 and Crosby v. Weil, 1943, 382 Ill. 538, 48 N.E.2d 386, are inapposite because they concern state Blue Sky laws. These statutes are very different from the takeover laws, and they involve matters traditionally within the province of state law. See also footnote 39.
The two cited Investment Advisors Act releases concern a different statute. They also represent the opinion of the SEC, which has rejected the narrow reading of “conflict” in its brief for this case. Finally, the language of the releases offers no substantial support for the appellant’s point. They only note in passing that state requirements not in conflict with federal law are valid. They do not define “conflict”.

. Hearings on H.R. 14475, S.510 Before the Subcommittee on Commerce and Finance, 90th Cong. 2d Sess. 4, 47-48 (1968) (House Hearings); Hearings on S. 510 Before the Subcommittee on Banking and Commerce, 90th Cong. 1st Sess. 17, 19, 25, 182 (1967) (Senate Hearings) (statements of Mr. Cohen), 113 Cong.Rec. 854; Cohen, Takeover Bids, Speech to the Association of the Bar of the City of New York, reprinted at Senate Hearings at 204-05; Note, *1277 Commerce Clause Limitations upon State Regulation of Tender Offers, 47 S.Cal.L.Rev. 1133, 1146 (1974).

. S.Rep.No.550, 90th Cong. 1st Sess. 3 (1967); H.R.Rep.No. 1711, 90th Cong. 2d Sess. 3 (1968); U.S.Code Cong. & Admin.News 1968, p. 2813.

. S. 2731 would have subjected some tender offerors and persons associated with an offeror to the reporting and short swing profit liability provisions on § 16 of the 1934 Act. It would have required persons making cash tender offers and certain other securities acquisitions to make advance disclosure and filings. It also would have granted rulemaking authority to the SEC on the subject of a corporation’s purchase of its own securities.

. See 112 Cong.Rec. 19003 (1966); Senate Hearings at 123 (statements of Prof. Painter and Sen. Williams), 133-34 (statement of Prof. Kaplan).

. See also Aranow, Einhorn & Berlstein, Developments in Tender Offers for Corporate Control 227-29 (1977); Federal Securities Code § 607, comment (2) (Proposed Official Draft 1978); Shipman, Some Thoughts About the Role of State Takeover Legislation: The Ohio Takeover Act, 21 Case W.Res.L.Rev. 722, 725 (1970); Sommer, The Ohio Takeover Act: What is It?, 21 Case W.Res.L.Rev. 681, 718 (1970); Subcommittee on Proxy Solicitation and Tender Offers, Federal Regulation of Securities Committee, American Bar Association, State Takeover Statute and the Williams Act reprinted at 32 Bus.L. 187, 193 (1976); Statutory Comment, Take-Over Bids in Virginia, 26 Wash. & Lee L.Rev. 323, 329 (1969).

. Idaho Code 30-1503(1).

. -Idaho Code 30-1503(4).

. See, e. g., Senate Report at 4; Senate Hearings at 59 (Statement of Prof. Hayes); Aranow & Einhorn, Tender Offers for Corporate Control 223 (1973); Austin & Fishman, Corporation in Conflict: The Tender Offer 127 (1970); Langev-oort, State Tender-Offer Legislation: Interests, Effects, And Political Competency, 62 Cornell L.Q. 213, 238 (1977); Wachtell, Special Tender Offer Litigation Tactics, 32 Bus.L. 1433, 1437-42; Wilner & Landy, The Tender Trap: State Takeover Laws and Their Constitutionality, 45 Fordham L.Rev. 1, 9 (1976).

. Among the restrictions imposed on target management by the federal law are Rule 13e-l, 17 C.F.R. § 240.13e-l (1977), limiting the ability of a target corporation to repurchase its own shares during a tender offer, and Rule 14d — 4, 17 C.F.R. § 240.14d-4 (1977) imposing disclosure requirements on incumbent managers who wish to recommend that shareholders accept or reject a tender offer.

. The appellant explains this rejection in part 51. because there are no federal fiduciary standards for corporate directors and officers. Appellants Brief at 39-40. See also Santa Fe Indus., Inc. v. Green, 1977, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480. This explanation is unsatisfactory. Congress could have relied upon state created fiduciary duties. Indeed, in this case Idaho would be relying upon fiduciary duties not created by her law, but by the law of the State of Washington.
In general, a state legislature may be entitled to assume that the directors and officials of a target company will honor their fiduciary obligations. It would not be surprising, however, if another legislative body declined to make the same assumption. To establish a claim under state law, a shareholder usually must overcome a presumption that directors act properly, and prove that they acted in self interest. Few plaintiffs have successfully met this burden. See, e. g., Cheff v. Mathes, Del., 1964, 41 Del.Ch. 494, 199 A.2d 548; Kors v. Carey, Del., 1960, 39 Del.Ch. 47, 158 A.2d 295. See also Senate Hearings at 121 (statement of Prof. Kaplan); Israels, Corporate Purchases of Its Own Shares — Are There New Overtones?, 50 Cornell L.Q. 620 (1965).

. Changing economic conditions may have disrupted the balance that Congress struck in the Williams Act. But, it is for Congress — not Idaho — to determine if adjustments in the federal balance are necessary, and if so, what adjustments should be made.

. We are not persuaded by the appellant’s argument that Idaho’s takeover statute is analogous to the state laws governing internal corporate matters and fundamental corporate changes such as mergers, that traditionally have co-existed with federal securities regulation. First, the law of Washington governs the internal affairs of Sunshine, so even if this argument had validity it would not justify Idaho’s regulation of the Great Western tender offer. See, e. g., Langevoort, 62 Cornell L.Q. at 222-23. Western Air Lines, Inc. v. Sobieski, 1961, 191 Cal.App.2d 399, 12 Cal.Rptr. 719, does not strengthen Idaho’s position. In Western Air Lines the court allowed California to assert some control over the internal affairs of a Delaware corporation. California had an unusually strong interest in the corporation, however, because over fifty percent of its shareholders were California citizens. See Reese & Kaufman, The Law Governing Corporate Affairs: Choice of Law and the Scope of Full Faith and Credit, 58 Colum.L.Rev. 1118, 1119-20 (1958). In contrast, only about two percent of Sunshine’s shareholders live in Idaho.
Second, a tender offer involves the sale of securities from one shareholder to another, not a change in the corporation itself. The voting rights of shares and the legal relationship between a corporation and its shareholders does not change because of a tender offer. Although a tender offer can be a substitute for a proxy contest, there are important distinctions between the two. In a proxy contest the existing shareholder transfers only his vote; the other aspects of his existing relationship with the corporation remain. A tendering shareholder severs the existing relationship completely. Note, Commerce Clause Limitations upon State Regulation of Tender Offers, 47 S.Cal.L.Rev. 1133, 1154 (1974). See also Senate Hearings at 118 (statements of Prof. Mund-heim and Prof. Kaplan). Statutes regulating the internal affairs of a corporation concern the existing relationship between a corporation and its shareholders. Since at the beginning of a tender offer the offeror may be a potential shareholder only, laws governing the offeror’s conduct are not logically based on control of internal corporate affairs. Note, 47 S.Cal.L. Rev. at 1154. See also Wilner & Landy, 45 Fordham L.Rev. at 17; Aranow, Einhorn & Berlstein at 230.

. The appellant cites Brotherhood of Locomotive Firemen v. Chicago, R. I. & P. R. Co., 1968, 393 U.S. 129, 89 S.Ct. 323, 21 L.Ed.2d 289, to support an argument that the Pike balancing analysis is not applicable to this case. Part of this argument is linked to the appellant’s contention that in § 28 Congress consented to the Idaho statute. We have already rejected that contention. The appellant also argues against applying Pike because the analysis adopted in Brotherhood is more deferential to state law than the analysis enunciated in Pike. Pike, however, refines Brotherhood, not vice versa. See Dixie Dairy Co. v. City of Chicago, 7 Cir. 1976, 538 F.2d 1303, 1308. Moreover, commentators have pointed out that Brotherhood is, at least in part, inconsistent with other recent commerce clause decisions. E. g., G. Gunther at 311. Brotherhood may still stand for the proposition that Pike balancing is inappropriate when the benefit of state legislation and the burden on interstate commerce are non-comparable. See American Can Co. v. Oregon Liquor Control Commission, Or.App. 1973, 517 P.2d 691; Procter and Gamble Co. v. City of Chicago, 7 Cir. 1975, 509 F.2d 69. But see Dixie Dairy Co. v. City of Chicago, 538 F.2d at 1308 (explaining Procter and Gamble). Any such principle is not relevant in this case because both the benefits of the regulation and the burden on commerce are economic.

. S. 510 originally included a procedure of confidential advance filings. Both the New York and American Stock Exchanges warned that the inevitable leaks that would result from the preparation of advance filings would disrupt the operation of the securities markets. See Senate Hearings at 72-73 (statement of Mr. Calvin), 98 (statement of Mr. Saul).
After hearing from the Exchanges, the Senate committee deleted the advance filing provision.

. To obtain a preliminary injunction in its Williams Act suit against Great Western, Sunshine first was required to show irreparable injury. Rondeau v. Mosinee Paper Corp., 1975, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12. It failed to do so. Sunshine Mining Co. v. Great Western United Corp., D.Id., 1977, [1977-78] CCH Fed.Sec.L.Rep. H 96,049.

. Great Western apparently inferred a New York prohibition of advance publication from the New York statute’s silence on the subject. See generally N.Y.Bus.Corp.L., art. 16, §§ 1600-13 (McKinney Supp.1976). An amendment to § 1602 of the New York statute eliminated a requirement that an offeror publish the terms of its proposed takeover bid. N.Y.Bus.Corp.L., art. 16, § 1602 at 69 (McKinney Supp.1976) (note on legislative history).

. One explanation of this heightened scrutiny is that those burdened by state legislation interfering with interstate commerce often had no role in the political process that produced the regulation. See generally L. Tribe, American Constitutional Law § 6-5 (1978).

. For the reasons already discussed, we have also considered but given less weight to evidence that the Idaho law could interfere with the functioning of the national securities markets, could change the strategy of those contemplating a national tender offer, and could have a general deterrent effect on national tender offers.